[No. 7655. Decided April 20, 1909.]

### *In re* PALMER's WILL.

MARGARET BETCHER, *Appellant*, v. JAMES BRADY,
*Administrator, et al., Respondents.*[1]

APPEAL—REVIEW—FINDINGS. On trial *de novo* on appeal of a will contest, findings of the trial court on conflicting evidence are to be reviewed by the supreme court on the record, and will be reversed if erroneous and the evidence is not equally balanced.

WILLS—EXECUTION—DURESS AND UNDUE INFLUENCE—EVIDENCE— SUFFICIENCY. The evidence shows that a will in favor of the husband of the testatrix was induced by duress and undue influence, and findings to the contrary will be reversed on trial *de novo* on appeal, where three disinterested and credible witnesses swore positively to many threats and constant importunities and intimidation upon the part of the husband, within their personal knowledge or related to them by the testatrix, whereby the testatrix, who had suffered a stroke of paralysis and was feeble and in her last sickness, was impelled to will to her husband property recently inherited by her, and which she wished to will to her daughter, her only living heir, because of her husband's intemperance and the wishes of her deceased son from whom the property was derived, such witnesses being unimpeached and unopposed on essential matters except by the testimony of the husband, who flatly contradicted all of them.

Appeal from a judgment of the superior court for Snohomish county, Black, J., entered March 21, 1908, dismissing, on the merits, an action to contest a will, after a trial before the court without a jury. Reversed.

*S. J. White*, for appellant.

*M. J. McGuinness* and *Robert McMurchie*, for respondents.

DUNBAR, J.—This is an action brought by Margaret Betcher to contest the will of her mother, the deceased Sarah Jane Palmer, on the ground of undue influence and intimidation wrought by her husband, James P. Palmer, in the procurement of the will in his favor. The property covered by the will was practically all inherited by the deceased

[1]Reported in 101 Pac. 220.

a short time before her fatal illness. The contestant is the only living heir of deceased. Sarah Jane Palmer was sixty years of age when she died. About the 1st day of January, 1907, she was stricken with paralysis, which finally caused her death. The will was executed upon February 7, 1907. The court found that the petition of Margaret Betcher contesting the will aforesaid should be denied, and that James Brady, administrator with the will annexed, should have judgment against her for his costs and disbursements. From this judgment this appeal is taken.

Several errors are alleged upon the introduction of evidence and upon technical legal questions, but with the view we entertain of the merits of the case, their discussion and decision become immaterial. The merits of the case, as found by the court, will be found in finding of fact No. 4, which is as follows:

"That at the time of making said last will and testament so proven and admitted to probate as aforesaid, the deceased was of sound and disposing mind and memory and in all respects competent to make a valid will, and that at the time of making said last will and testament so proven and admitted to probate as aforesaid the said deceased acted freely and voluntarily and of her own will and was not coerced, commanded, threatened or intimidated to the making of said will, and that said deceased was not unduly influenced by James P. Palmer, or any other person in the making of said will, and that in the making thereof she acted as a free agent and that the disposition of the property of said deceased as made in the said will was according to the desire, wish and will of the said deceased at the time of the making thereof."

The testimony in this case is not extensive, and we have examined it carefully, and are unable to reach the conclusion reached by the court in said finding of fact. We appreciate the fact that ordinarily, if the testimony seems anyways nearly equally balanced, this court, recognizing the advantage that the trial court has in viewing the witnesses, would hesitate to disturb its judgment. Nevertheless, the case is to be determined here upon the record, and the determi-

nation of the case from the record is a duty which this court cannot escape.

The record presents a plain conflict in the testimony. The first witness who was introduced by the contestant, viz., John W. Riddall, who was an old acquaintance of the deceased and her husband, and with whom they lived a long time prior to her death, swore positively that the husband was constantly telling her that he wanted her to make a will and will him that money that she was getting from Iowa; that she said, no, she did not want to do it; that in the first place he was drunk all the time and he would spend it and squander it, and in the second place, it should rightfully go to her daughter, because it had been left by her son, and that it was his wish that it should finally go to the daughter; that he would then get mad at her and would look at her, stare her in the face, and shake his finger at her, and say, "You must; you must. You have got to make it. I must have it," and would promise that if she would make a will to him, he would quit drinking; that she tried him for a while, and that he continued to drink; that the woman then positively told him that she would never make a will out to him; that the husband would commence talking to her about the will almost every day, making covert threats, saying, "You must; you have got to; you have got to mind me;" that sometimes she would turn her eyes away from him, and sometimes the tears would come in her eyes, but on the next day after she would say nothing; that when she was taken down with a paralytic stroke, he told her again that he wanted that will, and she told him, "No, I have told you that I did not want to will the property to you, but that I want it to go to my daughter;" and that over and over again the same thing would be brought to bear upon her; that the night before the will was made out, he was sleeping in a room adjoining them, the door being open, and that they talked all night nearly about the will, and finally the deceased said, "Well, I can't stand it any longer. This worrying over a few dollars is putting me in my grave and I

wont stand it.  I will make out the will just for the sake of peace;" that she said, "Get it made out as soon as you can, for God's sake, and let me have peace;" that she was so confused that she wouldn't get up and eat; said she had had no sleep and she didn't want anything, and she didn't get up; that the husband went and got the scrivener, Mr. Street, and he came up and made the will that afternoon; that Mr. Palmer told him how to make out the will—the conditions of it and that when the will was made out, the woman was so weak that Mr. Palmer held her hand while she signed it, and as soon as she signed it she broke down and cried like a child. This and much more was testified to by the witness Riddall, and we are unable to determine that this testimony was at all shaken on cross-examination.  The witness also testified that Mrs. Palmer was afraid of her husband.

Mary A. Schuster testified, that she was frequently at the house where Palmer and his wife lived, helping and doing a part of the work, and that the deceased said when she asked her how she felt, "I don't feel very good."  "I says, 'Why Mrs. Palmer?' she said, 'I had to make a will over to Uncle Jim;' that is her husband; and I said, 'I wouldn't do it.'  She said, 'No, I wouldn't do it, but he made me do that, and he said I have to do it;' she had to mind him."  The witness was a German woman and her testimony is a little awkward in expression, but she testified, in substance, that the sick woman took her hand, and adjured her not to tell anybody what she had been telling her about her husband; that she was afraid; and told her that he had intimidated her with a gun—came in with a gun in his hand and told her that if she did not mind him, that would go through her brain; and that since that time she would never stay alone in the house, and had asked Mr. Riddall if he wouldn't stay with her as long as she lived, saying that she was going to make another will before she died, and that her husband shouldn't have that money.  The witness also testified that the husband had come home on a certain occasion, had "got mean" with

his wife, went into the kitchen and got a gun and came back and was exhibiting it, pointing it, in the language of the witness, "at the poor woman." She also testified that Palmer had told her, when he stopped at her house to get her to go up and stay with his wife while he went for Mr. Street to make the will, that his wife did not want to make the will, but that she had to make it before she got worse; and in discussing an interview between Palmer and his wife, Palmer said, "Now, she has got to make a will to me, and I am going to make a will to her, and only just give Maggie—that is the daughter—a dollar, and his daughter a dollar so they could keep up their will, and so he said she understood about the arrangement, and he said, 'Wont you do it, Sarah?' and she said, 'I don't know; I can't say about it.' He said, 'You have got to do it; you have got to make that will over to me,' that same night; he just forced her to it. I heard it myself."

Minnie P. Judy, another neighbor woman who was about the house a good deal, assisting the deceased, and who was there at the time the will was executed, stated that Palmer objected to the bequest of $10 in the will to Mrs. Palmer's daughter, saying that one dollar was enough. She also gave the same description of the condition of the woman at the time of the signing of the will, and that after she had signed the will she "cried as hard as she could cry;" that after she had signed the will, the decedent asked her if she could make another will; said that she did not want to make the will that she had made; that Mrs. Schuster told her that she could not make another will, but that she would ask her husband about it; and she did ask him about it, and he said she could make as many wills as she saw fit to make; that she said the reason why she did not want to make that will in that way was that it was her son's money and he did not want Mr. Palmer to have it, and she did not want it to go that way. She also testified to threats made by Palmer to his wife to force her to sign the will.

S. F. Street, who drew the will, did not seem to be very certain about the condition of the woman, and did not undertake to testify whether she was competent to make a will and devise her property or not. When asked if he asked her whether it was her will or not and what she answered, the witness said, "She answered me that it was—as far as she was able. Of course, she was a very sick woman." He also testified, in answer to the question whether he saw anything that indicated undue influence, "Well, I couldn't answer that question very readily. Of course, I could not tell. Most of the talking was done by her husband, of course, because she was not able to talk much herself." He also testified that Mr. Palmer told him the conditions of the will; and finally, asked whether she was weeping or crying, he answered, "Well, she didn't do much laughing. She may have wept some. She was doing that a good deal most of the time.".

Mrs. Parker, a witness for the respondents, testified that she was acquainted with Mrs. Palmer; that she was with her during her sickness; that she had never heard her say anything about any undue influence being brought to bear upon her by Mr. Palmer or any one else; but she had heard Mrs. Judy and Mrs. Schuster advise Mrs. Palmer to make another will; that upon one occasion Mr. Palmer brought the wills into her presence and said, exhibiting the will that he had made, "This is a will I made to Sarah (Mrs. Palmer), and this is the one she made to me. In case either one of us passed away," he said, "the other would have a living." He said, "I have a daughter and she has one, and we have made these wills so that we would not be disturbed. If I should pass away, why she would have no bother." Dr. Hall, who was called in to see Mrs. Palmer shortly before the will was made, testified that he thought she had sufficient intelligence at that time to dispose of her property and was competent to do so. Mr. James P. Palmer, the husband, absolutely denies all testimony of the witnesses Riddall, Mrs. Schuster and Mrs. Judy, testifying that he and his wife lived in perfect

sympathy, and had never had any trouble at all concerning wills. Mrs. Judy and Mrs. Schuster, on rebuttal, testified that statements made by Mrs. Parker in reference to conversations which she alleged she heard between them and Mrs. Palmer were false; that no such conversations had ever occurred.

This is, in substance, the testimony in the case on the material points. We do not think that the fact, which Palmer was anxious to make appear in the record, that he had agreed with his wife to make a will devising all his property to her, and cutting off his daughter, in consideration that she would make the same sort of a will to him, proves anything in his favor. He was a man in good health and, so far as ordinary observation was concerned, there was no probability of his early demise; while his wife was in a condition of health which it was believed would soon result in death. The fact that he proposed to have such wills made, under the circumstances of the case, would rather tend to show a disposition to overreach her, than to enter into such an agreement for her benefit or even for a mutual benefit. Mr. Palmer is an interested witness, and this must be taken into consideration in weighing his testimony. If the will fails, the property will go to the daughter. The witnesses for the contestant are disinterested witnesses. It does not appear that it will be of any benefit to them, financially or otherwise, whether the will is sustained or rejected by the court. There was some attempt to show that the witness Riddall had sent a proposition to Palmer to leave the country and not testify in the case if Palmer would give him $300. This charge was not substantiated at all, and even if it had been true, the fact that he agreed to leave the country and not testify in the case would indicate, if it indicated anything, that if he stayed and was compelled to testify, his testimony would have to be opposed to the interests of Mr. Palmer. Mrs. Schuster and Mrs. Judy were simple-minded, good-hearted, hardworking women, neighbors of the deceased, and so far as the record shows, of

good character and absolutely above reproach.    The same might be said, it is true, of Mrs. Parker, the witness for the respondents, but her testimony was all of a negative character, she simply testifying that she had not heard any complaint made by Mrs. Palmer. But with this positive testimony of Riddall, Mrs. Schuster, and Mrs. Judy, unimpeached witnesses, opposed on essential matters only by the testimony of the beneficiary of the will, we are unable to reach the conclusion that the learned court did, that there was no undue coercion, or duress, practiced upon the decedent.

The judgment will therefore be reversed, and the prayer of the petition granted.

CROW, GOSE, MOUNT, CHADWICK, and FULLERTON, JJ., concur.

PARKER and MORRIS, JJ., took no part.