Edna M. Schoen instituted this proceeding by way of a contest of the will of her father, the late S.V. Riley. From a decree dismissing her contest of her father's will, Mrs. Schoen appeals. *Page 120 
Appellant's assignments of error go to the merits of the controversy, and need not be separately discussed, her contention being that from the evidence the court should have sustained her contest and set the will aside.
S.V. Riley, being about sixty-three years of age, and having for thirty-five years resided in the city of Seattle, died in that city, July 13, 1929, leaving an estate of the gross value of $12,500. Mr. Riley was twice married: by his first wife he had two children, appellant Edna M. Schoen and a son who died childless; by his second wife Mr. Riley had no children. Appellant has no children of her own, but has adopted a baby girl now known as Joan G. Schoen. Respondents Gertrude Shields and Myrtle Hutchinson are sisters of Mr. Riley, and the principal beneficiaries under his will, of which respondent W.W. Shields (who is the husband of Gertrude Shields) is named executor.
The will in question bears date April 19, 1929, having been made by Mr. Riley while he was a patient in a hospital at Ballard, and was admitted to probate July 18, 1929. By it appellant and her daughter Joan are each bequeathed the sum of fifty dollars and no more, Mesdames Shields and Hutchinson being beneficiaries thereunder to the extent of the remainder of Mr. Riley's estate.
Appellant contested the will, first, upon the ground that her father, at the time he executed the same, was incapable of making a will because of lack of testamentary capacity; and, in the second place, because the will, if signed by Mr. Riley while he was mentally competent, was by him executed as the result of undue influence exerted over him by respondents, together with his brother, Jewett Riley, and other persons acting in respondents' interest. *Page 121 
Appellant testified that she was born in Indiana, having been brought to Seattle with her parents when about a year old. A year later, appellant's mother died, whereupon appellant and her brother went to Oklahoma, where they resided for thirteen or fourteen years with their maternal grandmother. Appellant's father could write but little besides his name, and during this period of her life appellant kept in touch with him through her paternal grandmother, who lived in Seattle, and with whom appellant corresponded.
Upon the death of appellant's maternal grandmother, appellant came to Seattle, where she for a while resided with her uncle, Jewett Riley, and her grandmother. Appellant's father had remarried and was living with his wife in the city of Seattle, but appellant did not reside with her father, although she testifies that she was at all times on good terms with him, as well as with her stepmother. Upon the death of her paternal grandmother, appellant went to work as an apprentice in the telephone exchange at Ballard, residing with her aunt and uncle Shields, with whom she lived until her first marriage, which was unfortunate and was speedily terminated by divorce. After earning her own living for a while as bookkeeper, telephone operator, and cabaret entertainer, appellant, some twelve years prior to the trial of this proceeding, married Morris Schoen, with whom she has lived happily ever since; the first six years in Seattle, thereafter in California.
Mr. S.V. Riley's second wife died during the year 1926, and after her death Mr. Riley lived alone or with strangers. During the last years of his life he operated a lunch counter and confectionery store on the Kirkland ferry dock at the end of east Madison street in the city of Seattle. Mr. Riley at times drank to excess, and was occasionally assisted in the conduct *Page 122 
of his business by his brother, Jewett Riley, who was himself a man of some property and apparently helped his brother without expectation of personal profit or advantage, although we find in the record testimony to the effect that Mr. S.V. Riley had at times complained of his brother, saying that he (Jewett Riley) had bought too much stock and wanted to run the store into debt so that he, by advancing money, could obtain an interest therein. It would seem that this was only another instance of Mr. S.V. Riley's peculiar ideas concerning his family and their supposed designs upon his property. We attach no importance to this matter, which is purely a collateral issue, but it to some slight extent illustrates Mr. Riley's temperamental attitude towards his relations.
It is evident that, for several years prior to Mr. Riley's death, appellant was estranged from her aunts, the respondents in this proceeding, due to some old quarrel, and that much bitterness existed between appellant and Mr. and Mrs. Shields. In this proceeding, as in most will contests, many of the witnesses for the respective parties became violent partisans, and, in considering the questions presented, it must always be remembered that the cause must be decided on the facts and the law, free from prejudice, and without allowing the mind to be influenced by actions of the parties or any manifest bias on the part of some of their witnesses, regardless of whether or not such acts or bias might in themselves be deemed reprehensible, the actions of the parties being only important in so far as they have some bearing upon the issues to be determined.
Five wills made by Mr. Riley are referred to in the evidence. The first, no copy of which was produced, was made in 1927, or possibly earlier, and is referred to by Birdie M. Corbett, a witness on behalf of appellant, *Page 123 
who stated that Mr. Riley told her that shortly after the death of his second wife he had made his will in favor of respondents. The second of these wills bears date April 5, 1928, and is in evidence. By it Mr. Riley bequeathed to appellant five hundred dollars and gave the rest of his estate to respondents. Will number three was, at Mr. Riley's request, prepared by Mr. C.G. Moran, and bore date April 16, 1928, a few days after the execution of will number two. No copy of this will was forthcoming, but Mr. Moran testified that appellant was the principal beneficiary therein named. Another will, said to have been made by Mr. Riley, was referred to by his brother, Jewett Riley, in a conversation with appellant, Mr. Jewett Riley stating, as appellant testified, that his brother had made a will in favor of Mrs. Lena May Walden, who had worked for Mr. Riley about eleven years, including the period just before his death, and who testified as a witness on behalf of appellant. The fifth will referred to is the one which was admitted to probate, now being contested in this proceeding.
It clearly appears from the evidence that Mr. Riley was, to a great extent, concerned about his property and where the same would go after his death. He seems to have been at times under the impression that different members of his family were unduly anxious to obtain at least portions of his estate. It is evident that he would occasionally quarrel with his brother, Jewett, and his sisters, and make derogatory remarks about them to third parties, but, notwithstanding this, it appears that in the main he was fond of them and relied upon them for comfort and assistance in time of trouble.
While Mr. Riley regarded his daughter with affection, it not appearing that he ever quarreled with her, nevertheless we are satisfied that there did not exist *Page 124 
between the two that strong bond of love which generally exists between father and daughter. Appellant had not lived with her father since she was two years of age, and it is perfectly evident that he did not have for her that deep and abiding love which one would expect a parent to bear toward his only surviving child.
Appellant admits that when she and her husband adopted little Joan, she simply wired her father, "I have a baby girl," with the idea of letting him think the child was her own. Birdie M. Corbett, a witness on behalf of appellant, whose testimony has been already referred to, states that, when Mr. Riley received this message from his daughter, he laughed about it, stating that he was satisfied that the baby was a foster child only. It does not appear that he had any objection to the adoption of a child by his daughter, but the fact that he understood the true situation may explain his apparent indifference toward the baby and his failure to provide more substantially for her.
It appears beyond question that respondents and Jewett Riley cordially disliked appellant. There is also some indication in the record that appellant's father did not like her husband, Mr. Schoen, although appellant says they were on good terms and at all times friendly. We consider it probable that Mr. Riley was not particularly fond of his son-in-law.
[1] We shall now proceed to discuss appellant's argument. In the first place, she contends that, as one of the witnesses to the will which she is contesting was the lawyer who drew the same, and the other was a stranger to Mr. Riley, who never met him before being requested to come in and act as a witness to the will, the testimony of these witnesses is not entitled to much weight. Our attention is not called to any legal objection to the common practice of the attorney who draws *Page 125 
a will acting as a witness thereto. We are satisfied that all formalities in connection with the execution of the will were observed, and that the testimony of the subscribing witnesses thereto is entitled to serious consideration.
[2] To discuss the quantum of proof which appellant must introduce in order to lift the burden which rests upon her as contestant and to overturn the will, would not be profitable. Such matters cannot be measured with a foot rule, or weighed in a scale. In such a case as this all of the testimony should be carefully considered, both by the trial court and this court, and, bearing in mind several general, controlling principles of law, such a decree should be entered as the evidence requires. We shall not decide this case upon any technical rules as to the burden of proof, but upon what we consider to be the substantial weight of the testimony, due consideration being given to the opinion of the trial court which had the advantage of hearing and seeing the witnesses.
At the time the will was offered for probate, appellant appeared with her counsel and requested leave of the court to cross-examine the subscribing witnesses. This request, at the suggestion of the attorney for respondents, was denied, of which ruling appellant complains, arguing that respondents' objection to such cross-examination affords some basis for argument that the execution of the will was somehow veiled in mystery, or that the urging of the objection gives rise to a suspicion of fraud. We find in the evidence no warrant for any such contention, nor any record concerning the same which avails the appellant anything.
In considering such questions as are here presented, authorities are of little assistance; each case must be decided upon its own facts, and, while we have carefully examined the cases relied upon by appellant, *Page 126 
as well as those cited by respondent, we find few which aid us in determining the questions here presented, which must be decided upon the evidence. We agree with appellant that the cases ofRathjens v. Merrill, 38 Wn. 442, 80 P. 754; In re Palmer'sWill, 52 Wn. 644, 101 P. 220; In re Tresidder's Estate,70 Wn. 15, 125 P. 1034; In re Beck's Estate, 79 Wn. 331,140 P. 340; and Roe v. Duty, 115 Wn. 313, 197 P. 47, were correctly decided, and that these opinions state the correct rules of law applicable to the facts presented in the respective cases, but we are also satisfied that this case is not controlled by any of the authorities cited.
Appellant relies strongly upon the fact that both the will now before us and one of Mr. Riley's prior wills were drawn for him by attorneys who were sent to him by W.W. Shields, one of the respondents. In neither case does it appear that Mr. Shields did anything more than tell the attorney to go to Mr. Riley, who desired to make his will. Each of the attorneys testified that none of respondents were present when Mr. Riley gave instructions concerning the respective wills, nor when the same were executed. The fact that in each instance Mr. Shields sent the lawyer to Mr. Riley is entitled to consideration, but in our opinion this fact is not deserving of the importance contended for by appellant.
As above stated, a few days after making the will of April 5, 1928, in favor of respondents, Mr. Riley retained Mr. Moran to prepare another will in appellant's favor. Mr. Moran testified that, at the time Mr. Riley instructed him to draw his will, Mr. Riley's manner was such as to cause Mr. Moran to wonder as to Mr. Riley's testamentary capacity. Mr. Riley was then with a friend of his, Mr. G.K. Algire, who was evidently a strong partisan of appellant. It is significant *Page 127 
to note that on this occasion only did Mr. Riley execute a will in his daughter's favor.
Mr. Riley, having been for some time quite ill, was, April 15, 1929, taken for treatment to the hospital above referred to in Ballard. From that date Mr. Riley was under the care of Dr. C. Melgard, who had prescribed for Mr. Riley on previous occasions when Mr. Riley had been a patient in the hospital. The doctor testified as a witness on behalf of appellant, stating that Mr. Riley was suffering from heart and kidney disease, also from hardening of the arteries. The witness stated that, at the time Mr. Riley entered the hospital in April, 1929, he (the doctor) did not expect that Mr. Riley would recover. Dr. Melgard furnished the only medical testimony in the record, and his opinion as to Mr. Riley's condition is, of course, entitled to great weight. The doctor states that Mr. Riley was at times fit to transact business, and that at other times he was not; that he would sometimes carry on a connected, intelligent conversation, and that at other times his mind was not functioning normally. The patient was old and very ill, and there is nothing unusual in the fact that at times his mind was not normally clear. Such a situation is far from indicating testamentary incapacity.
Mr. Riley remained in the hospital from April 15 to May 19, on which latter date he was taken to the home of his sister, Mrs. Shields. Later, he returned to the hospital, where he remained a few days for treatment. The doctor from time to time tapped Mr. Riley's lungs, removing therefrom fluid which gathered there, and directed the nurses in caring for the sick man. On cross-examination, Dr. Melgard stated that he on one occasion told Mr. Riley that "if he had any financial matters to settle it was best to settle them now," and that Mr. Riley appeared to understand the *Page 128 
doctor, and indicated that he would follow the doctor's advice. The doctor also mentioned this matter to respondent, Gertrude Shields. The will now before us was evidently executed pursuant to this suggestion.
Dr. Melgard was appellant's witness, and, as stated by the trial court, he "to say the least, offered no indication of being favorable to Shields and the sisters." It would seem that the suggestion that Mr. Riley place his worldly affairs in order came from the doctor, rather than from respondents, and we agree with the trial court, again referring to the able and comprehensive memorandum opinion which is before us, that it must be assumed that the doctor would not have suggested that Mr. Riley make his will if the doctor had not believed that his patient was mentally competent to perform that important act.
On cross-examination, respondents' counsel asked Dr. Melgard his personal opinion as to Mr. Riley's mental condition at the time in question, which the doctor declined to give for the reason that, in his opinion, he was not testifying as an expert witness, the doctor stating: "I am here just as a witness to state the man's condition, and not my opinion." Respondents' counsel, on cross-examination, propounded to the doctor many questions as to what happened between him and Mr. Riley, and as to Mr. Riley's condition. From this cross-examination, we quote the following:
"Q. Do you recall the conversation you had with him? A. Well, yes, I do to a certain extent. I told him if he had any financial matters to settle it was best to settle them now. Q. Did he understand what you were talking about? A. Yes, he appeared to. Q. What did he say? A. He said `Yes.' Q. He said he would? A. He said `Yes.' Q. And did you instruct anyone to see that he made a will or took care of his property? A. No, sir, I did not instruct anyone as to *Page 129 
that. Q. Did you mention the fact to anyone? A. I mentioned it to Mrs. Shields that it was best that he make out his financial matters, because I did not think he would be getting any better than he was at that time. Q. What time of day did you have that conversation? A. In the forenoon. Q. At that particular time when you spoke to him about having his financial affairs taken care of, was he in a proper state and was he competent when you spoke to him and said `You should take care of your financial affairs,' capable of making a will at that time? A. I could not answer that question. A man in this sort of a state of mind, you put a question to him and he will answer the question. That is, he may answer your question quite correctly, and yet I could not say he was correct in his mind to carry out a transaction. Q. Every time you asked a question at that time he answered intelligently? A. Yes, sir, as I remember that day. . . .
"Q. On the day you told him to take care of his financial affairs, can you recall any other conversation with him? A. No, I do not. Q. Can you recall that you saw him again that day? A. Yes, sir. Q. What was his condition the second time? A. As I remember it it was like it usually was. I did not carry on any particular conversation with him. Q. From your observation of him the second time that day, when you told him to take care of his financial affairs, was his condition as good as when you first talked with him? A. Yes, sir, it was. Q. And what time was the second time you saw him? A. It was possibly about nine o'clock at night. Q. Nine o'clock at night? A. Yes, sir. . . .
"Q. Would you as a doctor in attending a patient, knowing him to be insane, advise him to take care of his financial affairs, knowing he was incompetent to do so? A. Not if I knew he was not sane, no. Q. Would you if you knew he was insane? A. No, sir.
"THE COURT: I did not catch the answer.
"A. I said knowing the man was insane, as a doctor, I would not advise him to take care of financial matters. Q. The fact you told him to take care of his financial affairs on that particular day would infer you *Page 130 
thought he was capable of doing so, is that a fact? A. Well — Q. You can answer that question yes or no. A. Yes. Q. Now, did he do anything on that particular day when you advised him to take care of his financial affairs, which would lead you to believe he was mentally incompetent? A. No, not to my memory on that day. Q. Not to your memory? A. No, sir. . . .
"A. This man would at times — his mind would be correct, that is, as far as I was able to determine, and when I told him he should make out his will he said `Yes' and apparently answered my question as sanely as anyone, and in my opinion at the time his mind was functioning correctly, so he should be able to execute his will correctly, if he was executing his will according to his own ideas, but the thing is a man in this condition in ten minutes he may not be in a correct state of mind, and consequently I cannot state whether this man was sane at the time he made out his will. I was not there when he made out his will. Q. I did not ask you about when he made out his will. A. That was the way I understood the question. When I saw the man he was apparently sane at that time. I saw nothing insane about him. This was not an insane man. He was suffering from a mental condition secondary to his physical condition, and he may answer correctly when I talked with him in the morning and in the afternoon he would not be able to do so. When I talked with him in the morning he answered correctly, and as far as I can say he was sane at that time. How he was in the evening or at the time when he made out the will I do not know. Q. Would the same answer apply to the evening visit when you saw him? A. I do not recall the evening exactly. I do not recall it to my mind. Q. You said you saw him that night? A. Yes, sir, I did. Q. Did anything happen at that time to lead you to believe his condition was not the same? A. If anything unusual had taken place I would have remembered it, I think. Q. As far as you know then — A. As far as I know, yes. Q. As far as you know at nine o'clock that night his condition was the same as it was in the morning? A. As far as I can recall. Q. And he was sane if he was sane *Page 131 
in the morning? A. As far as I can determine. He carried on his conversation in the usual manner and as sane as anyone could at that time. I was not there when the man made out his will. Q. Now, assuming this man's condition was the same at the time he made out his will as when you saw him at the time you just testified to, was he in your opinion capable of understanding the nature of the transaction which he was doing? A. I think he would understand the nature of the transaction, yes. Q. In your opinion would he have been able to make a will, knowing what he was doing? A. How do you want me to answer, yes, or no?
"THE COURT: You can answer yes or no.
"A. Yes.
"MR. SAVAGE: That is all."
We shall now consider the testimony given by the nurses in the employ of the hospital who cared for Mr. Riley while he was a patient under their charge. At the outset, it must be observed that it is evident that discord prevailed in the hospital during the months of April and May, 1929, and that the employees were disagreeing among themselves concerning matters foreign to this inquiry. During this period the head nurse was discharged, and her place was taken by one who had theretofore occupied a subordinate position.
Several of the nurses testified vigorously for appellant; others appeared as strong partisans of respondents. We are much impressed by certain circumstances disclosed by the hospital records which are in evidence, and which speak for themselves, clearly, without bias or prejudice. In the first place, the nurses agreed in stating that, if a patient was irrational, that fact should be noted upon his chart. This was admitted by one of the nurses who testified by deposition as a witness on appellant's behalf, the witness evidently being of the opinion that Mr. Riley was mentally incompetent. On cross-examination, however, *Page 132 
this witness admitted that Mr. Riley's charts contained no notation to the effect that Mr. Riley was irrational until a date long after the execution of the will, when the witness made such a note on the chart.
We cannot but conclude that had the nurses who testified on behalf of appellant, while they were caring for Mr. Riley during the month of April, believed that his mental condition was as bad as in their testimony they endeavored to make it appear, they would have made some notation to that effect on the charts.
Appellant makes much of the fact that, on the day Mr. Riley signed the will, the chart shows that he "fell out of bed while asleep." It appears from the testimony that, because of his heart affection, Mr. Riley could rest more easily sitting up than lying down. We attach no importance to the fact that on this day while asleep Mr. Riley fell out of bed. The testimony clearly shows that the fall did not hurt him any, and we regard the matter as of no importance one way or another.
We are much impressed by the testimony of respondents' witnesses, Albert W. Johnson and John Landro, who were patients in the hospital during the month of April, 1929, occupying beds in the same room with Mr. Riley. These witnesses were apparently absolutely disinterested, and their testimony as to Mr. Riley's mental condition was given fairly and without noticeable bias or partisanship. Both witnesses testified that Mr. Riley, at and after the time he executed his will, was rational and seemed to be in full possession of his mental faculties. He was, of course, very ill, but, in the opinion of these two witnesses, his mentality was unimpaired. The witnesses were present when the will was prepared and signed, and their testimony as to what then happened is extremely persuasive in favor of the validity of the will. They testified at *Page 133 
length and were thoroughly cross-examined, their answers to counsel for both parties being, apparently, always full and frank. Their close association with Mr. Riley, and their casual conversation with him, during the long days when they were all sick and suffering, gave them ample opportunity for the formation of opinions as to Mr. Riley's mental condition.
The evidence as to the testator's mental condition is voluminous and conflicting. It may be noted at this point that the trial in the superior court occupied a week. The trial court listened patiently to the testimony, and very ably reviewed the same in its memorandum opinion, coming to the conclusion that Mr. Riley was, at the date he made his will, mentally competent to perform that action. Further discussion of this phase of the case would not be profitable. We can only say that a careful examination of the evidence convinces us that the finding of the trial court on this point was correct, and is supported by the preponderance of the evidence.
On the other phase of the case, that of undue influence, much testimony was introduced, and it is not easy to reconcile the testimony of the different witnesses. It is clear, however, that the will which appellant is attacking was not executed because of some sudden whim on the part of Mr. Riley, but that this will is not inconsistent with some of his testamentary ideas and wishes as indicated by his actions over quite a period of time. It may be admitted that his treatment of his daughter seems harsh, but, at the same time, it is evident that the different parties to this proceeding, from their respective standpoints, and Mr. Riley from his, were at times in their dealings one with another, as individuals and as groups, actuated by motives, prejudices, likes and dislikes, which are not fully explained by the record before us, and which cannot *Page 134 
by an outsider be adequately understood or appreciated.
Appellant makes much of the fact that, when she came to Seattle shortly before her father's death, some of the respondents had instructed the hospital authorities not to allow appellant to see her father, and when, after Mr. Riley had been removed to the Shields home, appellant went there with her baby and a woman friend to see her father, she was refused admittance. In this course towards appellant we are wholly out of sympathy with respondents, who, by their actions, gave appellant just cause of complaint, and afforded good ground for argument that respondents had exercised a wrongful dominion and control over Mr. Riley, to appellant's prejudice. Were it not for the historical background disclosed by the evidence, these acts on the part of respondents might well justify appellant's position. It is not the business of the court, however, to punish respondents for conduct towards appellant which the court may believe to have been unjustified and wrong. The case must be decided upon the evidence, having due regard to the applicable principles of law.
[3] Appellant alleged in her petition that her father's will was made as the result, not only of influence exerted upon him, but of undue influence so exerted, and that, by reason thereof, the document was not in fact his will, and that the same operated to her prejudice. It clearly appears that respondents and other members of their family did not like appellant, but this is not sufficient to require a decree setting aside Mr. Riley's will.
This court, in In re Patterson's Estate, 68 Wn. 377,123 P. 515, said:
"To vitiate the will an influence must be shown which, at the time of the testamentary act, controlled *Page 135 
the volition of the testator, deprived him of free will agency, and prevented an exercise of his judgment and choice."
In the later case of In re Roy's Estate, 113 Wn. 277,193 P. 682, appears the following:
"Wills are favored in the law, and it is a cardinal principle of construction that the testimony to overcome them must be cogent and convincing. In re Geissler's Estate, 104 Wn. 452,177 P. 330. Where the will, rational on the face of it, is shown to have been executed in legal form, the law presumes testamentary capacity. In re Hanson's Estate, 87 Wn. 113,151 P. 264. . . . To vitiate a will on the ground of undue influence, the evidence must show that the testator's volition at the time of the testamentary act was controlled by another, and that the will was not the result of a free exercise of judgment and choice. Converse v. Mix, 63 Wn. 318, 115 P. 305; In rePatterson's Estate, 68 Wn. 377, 123 P. 515."
In the case of Roe v. Duty, 115 Wn. 313, 197 P. 47, this court said:
"To vitiate a will there must be more than influence. It must be undue influence. It was not undue influence for the son to persuade or solicit his mother to award him the greater part of the estate rather than to award it to the daughter. Influence becomes undue only when it overcomes the will of the testator or the testatrix, when the act of making the will is the result of such coercion that free agency is destroyed. The disposition of the property may be changed by the influence exercised, but so long as the mind of the testator or testatrix is not overborne by the mind of another, it does not amount to undue influence."
Applying the well recognized principles of law to the facts disclosed by the record before us, we can only conclude that the trial court was correct in holding that appellant had failed upon this phase of the case, as well as upon the matter of her father's mental competency *Page 136 
to make a will, to submit testimony which would support a decree in her favor.
The decree appealed from is affirmed.
FULLERTON, PARKER, MAIN, HOLCOMB, MITCHELL, and BEELER, JJ., concur.