I am unable to agree with the majority opinion.
Many disinterested witnesses testified to the mental condition of Mrs. Denison. Dr. D.A. Nicholson, specialist in nervous and mental diseases, examined Mrs. Denison in Providence hospital on December 10, 1943, and concluded that she was suffering from a mental condition known as senile dementia. He stated that she was "confused and very forgetful, especially on recent events, and was forgetful as to remote events." Speaking of senile dementia, he stated:
"It is a slowly progressive disease which may be present for months or years, depending entirely upon the stage that we find the patient in . . . A. I would not expect her to be capable of making a will that would be legal on that date. The will might speak for itself. Q. Will you explain what you mean by saying you would not expect her to execute a will that would be legal? A. Because at *Page 720 
the time that I examined her, she stated that she had one brother living in Seattle, that his name was `Mickey' or `Milkey.' The doctor was with me, and he told me she did not have a brother. Of course, I only have his statement for that. She said the building we were in was a roominghouse, the Providence hospital was a roominghouse. She said the month we were there was September. The month was December. Then when I asked her to name the months of the year and give them in order, she said the first month was January, the next was July, the next was June, and then February. I asked her what year this was, and she said that this was 1931, and I asked her when she was born, and she said in 1933."
It is true that the doctor was mistaken about some of the facts, however his conclusion was based upon other facts relative to dates and the patient's general condition.
Dr. H.G. Lenz, a general practitioner, had been Mrs. Denison's family doctor for twenty-five years. He testified that she suffered from senile dementia and had been mentally deranged for the past two years of her life and that she at one time stated: "I didn't know that I owned the lot where the Providence hospital is." Asked if he believed that Mrs. Denison was capable of making a will, he answered, "No, no, I do not."
Dr. Nathan K. Rickles, a specialist in nervous and mental diseases for a long period of time, testified as an expert in answer to hypothetical questions as follows:
"Q. Dr. Rickles, are you familiar with a malady or disease commonly designated as senile dementia? A. Yes, I am. Q. Will you explain just what the common experience is in the development of that disease in a person of the female sex of the approximate age of seventy-six years? A. Senile dementia means, from the term itself, a disease of old age in which the mind is affected. It is usually a chronic progressive disease which starts out rather insidiously in which the patient has early defects in memory, which becomes progressively worse, particularly with recent events. They may be very sharp on the events of their childhood, but they show a tremendous inability to recall recent events. You can ask them who the president is, and they may say Wilson or Teddy Roosevelt. They show a very definite loss in judgment, inability to reason properly, *Page 721 
largely due to the fact that their memory is poor. They develop signs of arterial sclerosis, which is hardening of the arteries, that resulting from deterioration due to the fact that the blood supply to the brain is not what it should be. The brain requires a great deal of oxygen, and when there is a lack of blood supply or a lack of proper exchange of blood due to the hardening of the arteries and the veins, the brain, as a result, shows damage, and the memory becomes increasingly more defective, their judgment becomes more impaired, and eventually they are completely out of touch with their surroundings, their environment, and are unable to even so much as speak rationally on any subject. They develop evidence of heart conditions, eye conditions such as cataracts. They may develop such as paralysis; they become generally debilitated because lots of these patients refuse to eat, and they have to be forced to eat, and so they lose weight and become and generally die with some disease that generally goes along with old age such as heart condition or high blood pressure. . .. Q. Now, assuming, Doctor, that Dell Denison, who is now dead, is of Syrian extraction; has reached the age of seventy-six years; is totally blind, or I might qualify that a little bit maybe that one eye could distinguish light and darkness, but otherwise a cataract condition of both eyes; apparently dissatisfied everywhere at times; apparently sometimes recognizes people, people whom she has known for years, and then speaks of them as being a woman and man from a different city; and suffering from what one medical man has called an uncompensated heart, hardening of the arteries and breaking down of one lung, — I think he called it a spernotic lung — would that be right? A. A sclerotic lung. Q. Yes, sclerotic lung, and at times what might be called emotional exuberance; when in the hospital imagining she was in the basement and there was dancing going on around her, and young men were coming to see the Catholic Sisters, and staying with them; what would be your opinion of the malady from which such an individual would be suffering? . . . Q. Now, a person suffering from that disease, if found to be suffering with that disease, and if found by an examining psychiatrist or physician to be in need of a guardian because of that, and to be, as he expressed it, unable to — that is, a lack of sufficient mind to even entertain a delusion, in December of 1943, on December 10th, 1943, what would you say would probably be her condition on and preceding October *Page 722 
10th, 11th, 12th, of 1943? . . . A. Taking into consideration the past history given in the previous question, it would be my estimation that the woman was in the same mental state in October that she was in December. Q. And would a person in such mental state be competent to realize what their property is and to enter into any normal business transactions? A. I would say `no.'"
Mrs. Genevieve Rhyne, who cared for Mrs. Denison during a portion of the years 1942 and 1943, testified that the testatrix was obsessed with the idea that people were stealing from her and refused to eat anything that anybody brought in because she thought that they were trying to poison her. The witness was of the opinion that Mrs. Denison was irrational and unable to transact business.
Mrs. Matthew W. Hill of Seattle had known the old lady very well for about ten years and told of many peculiar incidents in her (Mrs. Denison's) life too numerous to mention in this opinion. One of the incidents that occurred while Mrs. Denison was in the Providence hospital was that "She thought that the hospital — her story to me was that the hospital had taken her home away from her and had put this place on her property. . . . She seemed to think it (the hospital) was her own house, but in some way they had altered it." While in the hospital Mrs. Denison secreted food that was brought to her and kept loaves of bread in her bed. Asked if she thought that Mrs. Denison was competent to make a will, Mrs. Hill stated:
"A. I think when she went to the Columbus Hospital she was definitely incompetent to do anything about her property. THE COURT: You are speaking now as far back as May and June in 1943? A. At the time she went to the Columbus Hospital. Q. Did you observe improvement in her mental condition after that? A. Not at all. She deteriorated even more from that time on."
Honorable Matthew W. Hill, husband of the witness to whom I have just referred and now superior court judge of King county, became acquainted with Mrs. Denison in 1930 and acted as her attorney in many instances. He told of her many peculiar actions. Among them was the desire *Page 723 
to move to someone's house in a taxicab and the idea that the hospital was her home. His evidence as to her competency was:
"Q. Now, Mr. Hill, between the time that Mrs. Denison went to the Columbus Hospital on May 21, 1943, and the time she went to the Providence Hospital on October 12, 1943, were you sufficiently conversant with her mental condition to form an opinion as to her competency to make a will or devise her property? . . . A. I think so. Q. Assuming this will to have been made and executed on the 12th day of October, 1943, what would you say of her capacity to make and execute a will? A. I don't think she was competent at any time after June or July of 1943."
Mrs. Emma Johnson, a trained nurse with twenty-five years of experience, cared for Mrs. Denison at the Gardner sanitarium from the latter part of July to the last part of September, 1943. Mrs. Johnson testified that the testatrix refused to eat or to take her medicine because she thought that people were trying to poison her. She cached food under her pillow or in her bed. The conclusion of the witness was that Mrs. Denison was insane.
Mrs. Maxine Geisel had known Mrs. Denison intimately for four or five years before her death and, in testifying concerning her condition, said, "Her mind was not very clear about anyone or anything towards the last." The witness was of the opinion that Mrs. Denison was not mentally competent to handle her affairs.
Mathilda Primley had known the testatrix for five years just prior to her death and testified that she (Mrs. Denison) had the hallucination that everyone who came in was robbing her and that her mind wandered. She gave as her opinion that Mrs. Denison "was not responsible for what she did or for what she was saying."
Mrs. Donna Tibbet testified:
"Q. What was her mental condition at that time? A. Oh, she seemed to be that she didn't know what she was doing. She said that they had taken the house away from me that she sold to me, and she said the Catholic people had taken the hospital away and tacked it onto my house, and she said, `Up there is your room,' and I said, `Oh, no, *Page 724 
they haven't moved the hospital,' and she said, `Oh, yes, they have; they have taken all of my property up there,' and I said, `No, you just think that,' and she said, `You go and ask Mr. Hill,' and I said, `I will,' and I think Mrs. Hill came up there and she talked to her about it and asked her how she was, and she said, `All right, but I haven't got no home anymore;' she said, `The hospital took all my property and moved the hospital up on Aurora Avenue,' . . . Q. Did she have the capacity to realize and transact business? A. No. She didn't know one paper from another. As I told you a while ago, she said she was making them a deed, and she said, `Don't you get scared, Mrs. Tibbets, I won't make them no contract,' and so she thought a contract was more binding than a deed."
Mrs. Annie Micheal testified that Mrs. Denison thought "that people from Vancouver were going to kill her."
Mrs. Adele Milkey, sister-in-law of the testatrix, testified as follows:
"A. She wouldn't go with me. She said I wanted to take her there to freeze her, and so she wouldn't go with me."
Other witnesses, and there were twenty-one in all, testified that the testatrix was not mentally competent to conduct her own business or make a will.
Opposed to the evidence to which I have just referred is that of several witnesses, none of whom were medical men. Mrs. Katharine Cross, sole legatee under the will and executrix named in the will, met the testatrix in 1938 and kept in touch with her until her death. The witness testified that Mrs. Denison was of sound mind and was able at all times to care for her property interest.
Vivian Cross, appellant's daughter, told about the fact that her mother had kept Mrs. Denison in her home, recalled many incidents concerning her welfare and habits and business ability. Her conclusion was that the old lady was able to understand normal business transactions.
Mrs. Martin, a friend of appellant, had known Mrs. Denison for five years and testified that her physical and mental condition was normal.
Mr. Cross was of the opinion that the testatrix was of average intelligence. *Page 725 
C.J. Harader met Mrs. Denison in September, 1943, at the Cross residence and saw her at that place on an average of once each week. The witness did not detect anything "out of the normal manner of speech or intelligence," and testified that she was mentally competent to handle and understand ordinary business transactions. Mrs. Harader's conclusion was similar to that of her husband.
Mrs. Leta Cutrell, one of the witnesses to the will, was a friend and neighbor of appellant and was requested by appellant to witness the signing of the will. Mrs. Cutrell had not met Mrs. Denison prior to that time. She stated that Mr. Monroe Watt, the attorney who drew the will, read it to Mrs. Denison before she signed it and explained it to her, and that Mrs. Denison said that it was her last will and testament and all of her estate went to Mrs. Cross.
Mrs. Myrtle Compton, another witness to the will who was called by the appellant to witness the will, had seen the testatrix on two prior occasions. She was of the opinion that Mrs. Denison was of normal intelligence. Asked if Mr. Watt discussed the contents of the will, Mrs. Compton stated:
"A. It seemed like once he talked about it and discussed parts about it, that this was her last will and testament, and that she was leaving all her personal property and belongings to Mrs. Katharine Cross, and did she clearly understand that, and she said, yes, she did, and that is the way she wanted it."
Mr. Monroe Watt, counsel for appellant in the trial court and in this court, prepared the will for Mrs. Denison. Prior to that time he had not met her, nor was he acquainted with Mrs. Cross or either witness. He was called to draw the will by appellant. He testified that he talked to Mrs. Denison at length about her property and concerning its disposition, that he drew the instrument at her direction. Mr. Watt was of the opinion that Mrs. Denison "was of sound and disposing mind and manner." The following excerpt from the evidence of Mr. Watt is of interest:
"Q. Then you asked her in detail about her property, didn't you? A. Not in great detail, no. Q. Well, didn't *Page 726 
you ascertain whether she had any money in the bank? A. No. Q. Did you ask her if she had any bonds or stocks? A. No. Q. Did you inquire if she had any war bonds? A. No. Q. Did you inquire if she had any savings accounts? A. No. Q. Did you ask her if she had disposed of any of her property recently? A. No. Q. Did you ask her who her attorney was? A. I think not. Q. She told you that she had an attorney? A. She told me that her property, that her affairs were handled by an attorney, that she had an attorney, and that she was dissatisfied. All I asked her about her property was what property she had. Q. All right. Now, just stick to this subject. You made no further inquiry about the attorney at that time? A. No. Q. You didn't ask what his name was? A. No. Q. You didn't ask where his office was? A. No. Q. You didn't ask how long he had served her? A. No. Q. And you didn't ask her what the nature of the trouble was? A. No. Q. Did you ask her why she didn't call her attorney instead of calling you? A. I don't know."
After the trial, the court took the case under advisement and later prepared a memorandum opinion. The opinion contains a lengthy and able review of all the evidence and the law touching upon this class of case. In speaking of the eccentricities of the testatrix, the court said:
"There are other bits of evidence in this record to which it is not necessary to refer, which indicate the troubled and disturbed mental condition of this woman, particularly during the spring, summer and fall of 1943. The court classifies these recurring accusations made against the counsel who had served her long and well, and against the nurses in the hospital, and numerous other people, as being the emanations of a mentally disturbed individual. They are quite a part of and quite in keeping with the record of her movements from the Tibbets to Columbus Hospital, from Columbus Hospital back to the Tibbets, from the Tibbets to the King County Hospital, from the King County Hospital back again to the Tibbets, from the Tibbets to the Gardner Sanitarium, from the Gardner Rest Home to Mrs. Coots, from Mrs. Coots to Mrs. Hughes, from Mrs. Hughes to Mrs. Benham, from Mrs. Benham to Mrs. Cross, and from Mrs. Cross to the Providence Hospital — all in a period of time from July to early October." *Page 727 
In making his conclusions, the trial judge said:
"The court is willing in the present case to found his conclusion as to the mental condition of the deceased at the time of making her will on October 12, 1943, upon the trained and experienced judgment of the two physicians, and that of Mr. Hill, her counsel, as against the somewhat hurried conclusions of the witnesses who signed the will. The two medical witnesses testify that for some period of time the deceased had been suffering from senile dementia, a disease of the mind and body. This fact alone will not quite suffice. In the case of In re Miller's Estate,10 Wn.2d 258, a case somewhat similar, the Supreme Court again announced what might be regarded as an important distinction in cases of this kind. It stated (p. 268):
"`If otherwise mentally sound, one is not incapacited from making a valid will by reason of his filthy habits, unsociability, and miserliness.'
"Page 273:
"`Even if Mrs. Miller suffered from hallucinations and delusions, unless they are related to the provisions of the will they are not material. It would not be sufficient to establish merely that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion.'
"The present trial court accepts with explanation but without reservation the supreme court's expressed view and pronouncement as to the proper rule of law in cases of the kind. Expressed in another way, the supreme court's opinion states that a person may be filthy, unsociable and miserly and still be legally competent to make a will. The high court has not said, of course, that evidence of habits of the kind may not be offered to establish the fact that the person was not a normal human being — and insanity, in view of the law, is not the normal state. In fact, symptoms of the kind are regarded by members of the medical profession as symptoms to be weighed and considered along withany and all other symptoms of the patient. On the point the experienced medical men, unlike the situation in the Miller
case, convincingly for the present court, agree that the patient was insane, suffering from a particular form of insanity. The physical and mental conditions which were found have already been stated, and will not be repeated. They are to the court entirely convincing. *Page 728 
"The second observation of the supreme court which, it is contended, is applicable here is predicated upon the existence of hallucinations or delusions. There are, the present court respectfully observes, mental cases where the mind is blank and there are no delusions of any kind whatsoever. In the present case, Dr. Nicholson, familiar with this general subject, spoke of this patient as having no `illusions' by reason of the fact that her memory was gone. He testified she was `confused,' `very forgetful,' as to recent and remote events; that [she] could not name the months; said she was born in 1933. Dr. Nicholson said `she was incapable of making or having delusions.'
"Dr. Lenz, the family physician who had known her for years, tells of this mental and physical condition from which she suffered `the last two years' or so. He tells, as do a long list of lay witnesses, of passing imaginary happenings which she would relate to him — the nurses were stealing her money, they were stealing her food and her medicine, she thought she owned the hospital property. These experiences are quite parallel to her former conveyance of some of her property to a stranger; her offer of her property to Mr. Hill, and the discretable [discreditable] picture of Mr. Tibbet driving people from his premises to prevent her transferring property — all of which came before the execution of the will.
"The acts are not those of a sound or discriminating mind even in accordance with the somewhat low standard demanded of testators. The testatrix, in the summer of 1943, had reached a mental state where she would respond to the most and latest human kindly contact. . . .
"The court must answer the question — would an unsound mental condition, of the kind herein described, affect or in some unreasonable measure direct the distribution of the property of the deceased at the time of making a will in October of 1943?
"The answer of the court is that the mind of the deceased, under the circumstances here shown, becomes a veritable lens through which and by which the facts and circumstances of daily life are distorted and exaggerated. To the sick mind of this woman, her property and its value were forgotten; she had no money, as she thought; and everyone was `stealing from her;' her brothers, her sister, her counsel, the nurses were `stealing from her,' and she became a refugee fleeing from hospital to sanitarium, from the home of one casual acquaintance to that of another. *Page 729 
Slights and grievances were imagined, distorted or exaggerated until a kind and patient brother was forgotten and a service rendered by a comparative stranger, of an actual value of one hundred dollars or less, became in her mind a sufficient consideration for the gift of a considerable estate to her temporary benefactor. The personal habits and conduct were not normal; her likes and dislikes were not normal; and her final act of distribution was not normal. It is the judgment of the medical witnesses in the case that the mind of this patient was suffering from a mental disease which impaired her faculties so that she could not think or reason with accuracy. With this conclusion the court agrees."
The evidence in the case upon which the majority rests its decision in part in the case of Gates v. Cole, 137 Iowa 613,115 N.W. 236, is entirely unlike that in the case at bar. In that case senile dementia was sought to be shown by the evidence of nonprofessional witnesses. In passing upon the evidence, the court said that it did not "furnish any foundation for the claim of senile dementia."
The case of Wisner v. Chandler, 95 Kan. 36, 147 P. 849, is a well-considered case in which the supreme court reversed the judgment of the trial court, upholding the will of a man named Wisner. The trial court based its judgment upon the holding that the testator was of unsound mind when he made his will. A study of that case reveals the fact that the opponents of the will depended almost entirely upon testimony intended to show that the testator was suffering from senile dementia at the time he executed his will. There is no reference in the decision to the evidence of doctors or of laymen who had known the testator for many years. The cited case is of no aid here because of the great difference in the factual situations of the two cases.
The trial court in this case did not base its decision upon the mere fact that Mrs. Denison was suffering from senile dementia, nor do I contend that the judgment should be affirmed upon that fact. I do contend, however, that the trial court was justified — more than that, he was compelled *Page 730 
— to reject the will because of the conclusive weight of the evidence produced by those who challenged the will.
In re Schafer's Estate, 8 Wn.2d 517, 113 P.2d 41, is not helpful either because in that case this court upheld the judgment of the trial court, who had seen and heard the many witnesses who had testified. In that case the doctor who had performed an operation on the testatrix the day after the will was drawn testified that she was of sound mind. The reason for the decision of this court in that case is reflected in the following statement in the last paragraph of the dissenting opinion:
"In view of the testimony of Mrs. Schafer's physician, it cannot be said that, at the time she made the will of January 13th, she lacked testamentary capacity."
The majority dismisses the cases of In re Forsman's Estate,177 Wn. 38, 30 P.2d 941; In re Johanson's Estate,178 Wn. 628, 35 P.2d 52; and In re Lundgren's Estate,189 Wn. 33, 63 P.2d 438, with the remark that each case must be decided upon its own facts. That statement is quite true and applies to every case. However, this court in nearly every decided case supports its holdings by older cases. In theForsman case this court upheld the decision of the trial court in holding a testator to be incompetent. In passing on that case we based our conclusion upon the fact that the trial court was the best judge of the facts and said:
"In the case at bar, as was said in Pond's Estate v. Faust,95 Wn. 346, 163 P. 753,
"`The advantage of the trial court in hearing the witnesses and noticing their demeanor and candor, sympathy or bias, while testifying is of more importance than usual, for the case practically hinges on the credibility and capacity of witnesses. Courts will presume sanity until that presumption is overthrown by competent and reliable evidence to the contrary. . . . we are not prepared to hold that the evidence preponderates against the findings of the lower court.'"
The facts in the Johanson case are similar to those of the case at bar in so far as age and memory of the maker of the will are concerned. In that case we based our decision to *Page 731 
a large extent upon the testimony of an attending physician who stated that the testator was incompetent.
In the Lundgren case we reversed the decision of the trial court which had upheld the will. In passing upon the issues presented, this court based its conclusion largely upon the report of physicians who had examined the testator in an insanity proceeding held sometime before the making of the will.
The facts in the case of In re Adams Estate, 164 Wn. 64,1 P.2d 840, are so entirely like those in the case at bar that I quote from it as follows:
"The belief of the decedent that she would be cured of disease by the magnetic treatments, the laying on of hands, given to her by an almost illiterate person who claimed to have the power of healing by virtue of the spirit control over him by a number of dead physicians, is significant of the decedent's weakened mentality. There were other incidents, the testimony as to which is undisputed, indicative of decedent's lack of testamentary capacity.
"A physician who attended Mrs. Adams prior and subsequent to December 10, 1926, the date on which she made the will in question, testified that the decedent was insane, mentally incompetent to transact business. There was other testimony that, for a year or more immediately subsequent to December 10, 1926, the decedent had an unfounded fear that a certain physician was `going to make away with her body and put it in Lake Union is what she told me.' During this same period, she manifested fear of the respondent. Another witness testified that she saw the decedent almost daily from 1918 until the day Mrs. Adams died; that, in 1925 and 1926, the decedent was not competent to do any kind of business; that the deceased was fearful that a physician `was trying to do away with her;' that when advised to consult her attorney, the respondent, she said, `I have lost confidence in my attorney.'
"That shortly after the making of the will, Mrs. Adams forgot the matter, is clearly established by the evidence. Respondent's physician witness testified that Mrs. Adams was in an advanced stage of senile dementia at the time of her death. There was an abundance of medical and lay testimony, which respondent failed to meet, that Mrs. Adams was mentally incompetent to make a will December 10, 1926." *Page 732 
It seems to me that if this court is to follow precedent then the judgment in this case should be affirmed upon the authority of the one I have just cited. While it is true that cases of this nature are tried de novo in this court, it is also true that we do and must depend upon the conclusions reached by the trial court, who has seen the witnesses and has heard them testify. We have so indicated this to be the rule in the following cases:Richardson v. Moore, 30 Wn. 406, 71 P. 18; Pond's Estatev. Faust, 95 Wn. 346, 163 P. 753; In re Williams' Estate,142 Wn. 637, 254 P. 236; In re Donohue's Estate, 143 Wn. 423,255 P. 370; In re Riley's Estate, 163 Wn. 119,300 P. 159; In re Larsen's Estate, 191 Wn. 257, 71 P.2d 47;In re Miller's Estate, 10 Wn.2d 258, 116 P.2d 526.
The rule just mentioned is my principal reason for affirmance in this case. The trial court saw and listened to the testimony of many witnesses through a long and well-presented case and decided in favor of the contestants upon conflicting evidence. A trial judge is much more than a commissioner named to take and collect evidence in a case. He is a judicial official provided for by our constitution and the laws of this state. He has had years of experience as a trial lawyer and as a judge. He is a student of human beings who come to the witness stand to give their stories. He has the opportunity and it is his duty to study the witnesses. In determining the credibility of the various witnesses and the weight to be given to their testimony, he takes into consideration their conduct and demeanor while testifying; their temper, feeling or bias, if any; their fairness or lack of fairness; their conduct and appearance while on the witness stand; the reasonableness or unreasonableness of the story they tell; their opportunity or lack of opportunity for knowing that about which they testify; the apparent capacity and intelligence of the respective witnesses and their capability to correctly observe and report the matters testified to by them. He gives such credit and weight to the testimony of each witness which under all the circumstances he deems such witness and his testimony is entitled to receive. The credibility of the *Page 733 
witness and the force of his, or her, testimony and the weight that should be attached to it are all matters concerning which the trial judge is the best judge. As has been stated in many of our opinions, the trial judge has an opportunity to test the credit and weigh the evidence of the various witnesses, which is denied to us who read no more than the words on the typewritten pages of the statement of facts.
In this case the trial court first heard the evidence of the doctor who had been the testatrix's family physician for twenty-five years. He was a man who was better able to judge than any other the condition of the mind of Mrs. Denison. The testimony of a family or attending physician is entitled to great weight. Richardson v. Moore, 30 Wn. 406, 71 P. 18; Pointsv. Nier, 91 Wn. 20, 157 P. 44, Ann. Cas. 1918A, 1046; In reBottger's Estate, 14 Wn.2d 676, 129 P.2d 518; In reJohnson's Estate, 20 Wn.2d 628, 148 P.2d 962.
Following Dr. Lenz's testimony we have that of two experts, doctors who have given the greater portion of their lives to the study of the mental condition of human beings. Added to this testimony was that of many witnesses who had known the testatrix intimately over a period of years and were certainly able to relate the change in her mental condition over quite a period of time. Opposed to this testimony was that of the interested legatee and her close personal friends, together with the testimony of the attorney who drew the will, a man who had never seen the testatrix prior to the day he was called to draw her will. He did not have that opportunity to ascertain Mrs. Denison's mental condition granted to the witness who had known her over a period of years. See In re Johnson's Estate, supra.
The evidence preponderates in favor of the decision arrived at by the trial court, and the judgment should be affirmed.
MILLARD and STEINERT, JJ., concur with SIMPSON, J. *Page 734