[No. 16665.  Department One.  May 13, 1922.]

*In the Matter of the Estate of* DAVID W. ADAMS.
BARBARA A. SMITH *et al., Appellants,* v. FRANK ST. SURE,
*as Executor etc., et al., Respondents.*[1]

WILLS (13)—VALIDITY—EXECUTION — ATTESTATION — EVIDENCE —
SUFFICIENCY. A will is executed by the testator although, on account
of weakness, another supported the arm of his hand in which he
held the pen.

SAME (13)—ATTESTATION—SIGNATURE OF WITNESS—REQUEST BY
TESTATOR TO SIGN. The request that a witness attest and subscribe
a will will be inferred where the attorney asked the testator if it
was his desire that the witness should sign and testator answered
affirmatively.

SAME (20)—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY. A find-
ing that a will was not induced by undue influence is sustained
where there was no proof of coercion or fraud and no suggestion
made by the beneficiary, the will was drawn by an attorney chosen
by the testator, while the beneficiary was not present, and it is
admitted that the testator had sufficient mental capacity.

SAME (7)—TESTAMENTARY CAPACITY—EVIDENCE—SUFFICIENCY. A
finding on conflicting evidence of mental capacity on the day the
will was executed is sustained where witnesses for the contestant
may have been mistaken while those for the proponent either testi-
fied truthfully or were guilty of perjury, and there was evidence
that the testator gave final instructions as to the provisions in the
will and was rational at the time in question.

Appeal from a judgment of the superior court for
Whitman county, Miller, J., entered April 21, 1921, in
favor of the defendants, in a will contest, tried to the
court.  Affirmed.

*Pickrell & Stotler, W. E. McCroskey,* and *S. R. Clegg,*
for appellants.

*U. L. Ettinger* and *Allen, Winston & Allen,* for re-
spondents.

[1]Reported in 206 Pac. 947.

FULLERTON, J.—David W. Adams died in Whitman county, Washington, on August 16, 1920, leaving an estate therein consisting of real and personal property. He left a will, in which he named Frank St. Sure as executor. The will was, in due time, presented for and admitted to probate, and St. Sure confirmed as executor. Mr. Adams left as his heirs at law a brother and certain nephews and nieces, and these, subsequent to the probate of the will, instituted the proceedings now before us in contest thereof. Issue was joined on the petition of the contestants by the executor and the beneficiaries under the will, and the trial resulted in a decree upholding the will. From this decree, the contestants appeal.

Mr. Adams, at the time of his death, was seventy-three years of age. He was a bachelor. For a number of years he had been in bad health, suffering from some form of heart trouble. The affliction, however, did not prevent him from looking after and managing his somewhat considerable estate, which consisted principally of farm lands. For the few years preceding his death he suffered from an affliction of the prostate gland, which was later diagnosed as cancer. As the disease spread he became more and more incapacitated, and intrusted the details of his business largely to others, although we do not find that he ever, prior to his last sickness, surrendered its general control. About the time the last of his afflictions began to trouble him seriously, he purchased a residence in the city of Colfax, to which he moved from his farm. As time went on, Mr. Adams became gradually weaker and much emaciated. The cancer spread to the bladder and rectum, causing him much pain, and more or less hemorrhage through the urinary organs. He finally reached a condition where he was confined almost entirely to his bed. On the evening of July 12, 1920,

he was taken to a hospital in the city of Colfax, and on the afternoon of the next day, the will here in question was executed.

It is here proper to point out that the will is in no manner unnatural or irrational. The value of his estate as a whole is not shown in the evidence. It is said in one of the briefs of counsel, and not questioned, that its value approximates one hundred thousand dollars. Of this property he gave to a Mrs. Asbury, his cousin, his city property, and a quarter section of his land, which was appraised at eighteen thousand one hundred dollars. He gave a quarter section of his land to charity, leaving it to his executor to select the particular quarter section which should be so applied. This bequest approximated eighteen thousand dollars in value. The remainder of his estate, some sixty thousand dollars in value, he gave to his brother and to his living nephews and nieces, share and share alike. Mrs. Asbury had a special claim upon the bounty of the testator. She had for many years been a member of his household. She had cared for his aged mother during her declining years, and had continued with him as his housekeeper after his mother's death. The quarter section of land given her was land which had been bequeathed to him in his mother's will. Nor was the gift to her a new thought on his part. In a will executed in 1916, prior to his mother's death, he gave to her a quarter section of land, subject to a life estate therein to his mother. Nor was the gift to charity a new idea with him. For a number of years prior to his death he had spoken of endowing a ward in a hospital where poor people could be treated without, as he considered it, excessive cost. Nor did any of his relations have any especial claim upon his bounty. None of them were residents of his household, and while he had for the greater

number of them the regard which normal people usually have for their worthy relatives, none of them had performed for him any special service which ordinarily appeals to gratitude.

On the appeal the appellants make three principal contentions, (1) that the will was not executed with the formalities required by statute; (2) that the will was executed under undue influence; and (3) that the testator had not sufficient mental or physical capacity to execute a will. These contentions we will notice in their order.

On the question of the formality of the execution of the will it is contended, first, that the will was not signed by the testator but by another, and that this other did not sign his name to the will as a witness, nor state that he subscribed the testator's name thereto at his request; and second, that one of the witnesses to the will was not requested by the testator to sign it as a witness. On the first branch of the objection, the evidence shows that Mr. Adams, at the time of the execution of the will, was very weak physically. That, just prior to the signing, he was lying in a bed, and to enable him to sign he was raised up and supported by a nurse and by the attending physician; the physician also supported the arm in the hand of which he held the pen. All of the witnesses, however, testify that he himself, while in that position, wrote his name as it appears on the will, without further aid or assistance from anyone. This is a signing by the testator, and not the signing of his name by another. The courts generally hold that a signature is not rendered invalid by the fact that another guided the hand of the testator when he signed the will; that such an act is the testator's own, performed with the assistance of another, and not the act of another done under the direction of the testator. 40 Cyc. 1104. If

guiding the hand of the testator does not take from the signature its character as the testator's own, manifestly the assistance here given will not have a contrary effect. There was therefore no need of the special form of attestation prescribed by the statute, and the general attestation was sufficient.

On the second branch of the contention, the evidence shows that the persons present in the room when the draft of the will was completed were the attorney who prepared the draft and the attending physician, who was named as executor of the will. When the attorney informed the testator that an additional witness would be required, he directed him to call a nurse. A nurse was called and the formal execution of the will proceeded with, the nurse signing as one of the witnesses. The nurse testified that she was not requested by the testator to sign the will, and it is on her testimony that the claim of informality is founded. But as we said in *Points v. Nier*, 91 Wash. 20, 157 Pac. 44, Ann. Cas. 1918A 1046, the request that witnesses should attest and subscribe a will may be inferred from the acts and conduct of the testator as well as from his express words; that the law regards substance rather than literal form in such matters, and that it was not essential that the testator should expressly request the subscribing witness to attest his will; saying further, that the active part of procuring the witnesses and requesting them to sign the will as such is not infrequently borne by the testator's professional counsel, and that if such counsel acts truly for the testator in his conscious presence and with his apparent consent, the legal effect is the same as though the testator himself had made the request. The soundness of this doctrine is not to be doubted. The ordinary testator does not usually know the statutory require-

ments necessary to a valid will. It is for this reason that he employs professional counsel. His desire is to make a valid will, and he expects, and has the right to presume, that his counsel will take all the necessary formal steps the legal execution of the will requires. His counsel is therefore his representative and agent, and whatever he does in the line of his employment is conclusively presumed to be done on behalf of his principal. There is evidence here that the attorney went much further than even his strict duty required. After the testator had signed the will, the attorney asked him if it was his desire that the witness mentioned should sign the will as witness, and that it was so signed after an affirmative answer was given.

The second of the principal contentions is closely allied to the third. But if we have correctly gathered the meaning of counsel, they contend that, were it conceded that the testator had sufficient mental capacity to make a will, the will executed is not his, but that of the attorney and Dr. St. Sure. But we find little evidence which supports this conclusion. Dr. St. Sure, it is true, had long been the testator's physician. He was also his personal friend, and evidently the testator had for him a high regard. It is in evidence that the subject of making a will had at times been talked over between them, and that in these conversations the testator had mentioned certain uses to which he contemplated granting a part of his estate, and consulted with the doctor as to the advisability and the best manner of so doing. When the subject was broached, the doctor talked with him concerning the matters inquired about as one friend would talk to another, but made no suggestion as to the manner in which he should dispose of his estate. At the time the data was being given to the attorney from which the will was afterwards prepared, the doctor was in

the room only occasionally, on professional visits, and only for short periods of time. After the will had been prepared, and before its execution, the doctor read it to the deceased in the presence of the witnesses, and in its execution gave to the testator the assistance we have before mentioned. Certain of the contestants also testified that, subsequent to its execution, the doctor told them that no will had been executed. The doctor, while admitting that such questions were asked him, denies the statements, although admitting that he gave evasive answers to the question. He says that the reason for this was that the testator had enjoined upon them secrecy, stating that he did not wish to be bothered by his relatives.

As to the attorney, he was a stranger to Mr. Adams, and was chosen from a number which Dr. St. Sure named to him when he expressed a desire for an attorney prior to the time the will was drawn. Mr. Adams, it is true, knew a number of attorneys practicing in Colfax, some of whom had formerly performed legal services for him. He objected to these because as he stated, he thought their charges excessive, and chose the particular attorney from among those he did not know, presumably because of his acquaintance with the attorney's father. When the attorney reached the hospital after being summoned, he was introduced to the testator by Dr. St. Sure, who was then at the hospital. After the introduction, the attorney requested the doctor to leave the room, and while alone with the testator took the data from which the will was written. What occurred in the room is known only from the testimony of the attorney, but there is no circumstance which in any way indicates that he did more than follow strictly the testator's instructions. Undue influence which will avoid a will must amount to coercion or fraud. It must be an in-

fluence tantamount to force or fear which destroys the free agency of the party and constrains him to do what is against his will. Conceding, therefore, that the testator had legal capacity to make a will, we find nothing in the testimony which would justify a conclusion that this will was other than the will of the testator.

The third of the contentions has given us the most difficulty. There is no question that Mr. Adams was, at the time of the execution of the will, greviously ill. As we have before indicated, he was suffering from a disease for which there was no hope of cure, and for which little could be done in the way of alleviation. He was weak and much emaciated. He was given to involuntary micturition, in which he passed blood. He suffered at all times from great pain, particularly when he attempted to get on his feet or assume a sitting posture. He had been given no nourishment other than water for some hours before he executed the will, and during the period the attorney was with him he was given a stimulant in the form of whiskey. Shortly before the noon hour of the day on which he was taken to the hospital he was given an opiate, and another was administered to him shortly prior to his removal. While there were certain witnesses for the contestants who gave it as their opinion that the testator was not sufficiently competent to make a will for many months preceding the time of his removal to the hospital, some of them extending the time back for a period of years, we think these opinions unfounded. The evidence is clear to our minds that his mind was normal up to the time he was taken to the hospital, and for a considerable part of the time between that time and the time of his death. The troublesome question is his condition on the particular day. There is much to the effect that he was then in a state of coma,

from which he did not arouse for two days thereafter, and that during this time visitors were excluded from his room; the excuse given being that he was not in a condition to see anyone.

On the other side, the nurse who attended him the first night he was at the hospital says he had a good night; that, at about three o'clock in the morning, he called her to his room by an electric call bell, and that, when she went to him, he asked for a drink of water. The Sister of Charity in charge of the hospital says that she visited him at about nine o'clock on the next morning and that he was then rational; that he knew her and called her by name, remembering her from the circumstance that he had once before spent some time in the hospital. Dr. St. Sure testifies that he was rational on the morning after he reached the hospital. The attorney testifies that, in the preparation of the will, the testator gave him at first only a general description of the property which he wished to give to Mrs. Asbury, and that, when he advised him that the description should be specific, the testator told him where the specific description could be found, saying that his dwelling house was on ''A'' street in the city of Colfax and its description could be found from the records; that the quarter section of land was the one he had received from his mother, and its specific description could be found at the court house, in the papers filed in the probate of her estate. When he reached the charitable bequest, the testator was again puzzled as to the form it should take, finally inquiring of the attorney whether it would be legal to leave both the selection of the quarter section of land and the choice of the particular charity to his executor, and on being informed that it would be legal, directed him to put it in the will in that manner; that, when the disposition of the residue was reached, he made a sug-

gestion to the testator and was rather curtly told that it was the testator's will and not the attorney's that was being drawn.

The testimony fills many pages of the written record, and at best only an epitome of it can be given here. But we feel that we need not review it further. A careful examination of it convinces us that the witnesses testifying for the contestants could be mistaken as to the testator's mental condition on the day the will was executed. But no such charitable conclusion can be drawn for the witnesses on the other side. Either they testified truthfully, or they committed flagrant and wilful perjury, and were guilty of crime. The trial court refused to draw this conclusion, and we cannot say that it was in error.

The judgment is affirmed.

PARKER, C. J., MITCHELL, TOLMAN, and BRIDGES, JJ., concur.