[No. 22484. *En Banc.* August 6, 1931.]

*In the Matter of the Estate of* ELLA ELIZABETH ADAMS, *Deceased.*

FREDERICK W. YATES, *Appellant,* v. CHAS. W. JOHNSON, *Respondent.*[1]

*Arthur H. Hutchinson,* for appellant.

*Chas. W. Johnson* and *Walter H. Hodge,* for respondent.

*Florence Mayne Hickey, Amica Curiae.*

MILLARD, J.—This is a will contest. The petition alleges that the will was executed at a time when the decedent was mentally incompetent, and was the re-

[1]Reported in 1 P. (2d) 840.

sult of undue influence of the beneficiary thereunder. From the judgment sustaining the will and dismissing his petition, the contestant has appealed.

For approximately one year prior to the drafting of her will, Mrs. Ella Elizabeth Adams, a widow without children, was a client of the respondent, an attorney at law. For all of the legal services he ever rendered to her, Mrs. Adams paid to that attorney fifty dollars. On December 10, 1926, the decedent, who was between sixty-seven and seventy years of age, called at the office of respondent, who drafted her will in which the respondent was named the sole executor, without intervention of the court, without bond, and the sole beneficiary. It fairly appears from the evidence that, at this time, Mrs. Adams was fearful that the son of a man with whom she had been living illicitly would obtain her property. The pertinent provisions of the will read as follows:

"It is my desire that my body be held in state for a period of seven days after my death, and upon the eighth day, or as soon thereafter as can conveniently be arranged, it is my desire that my body be disposed of by cremation and burial, accordingly. SECOND: I will, devise, and bequeath all of my property, both real and personal, to my friend and legal adviser, Chas. W. Johnson, an attorney at law residing at Seattle, Washington, in whom I have imposed trust and confidence, the said estate to pass immediately upon my death to the said Chas. W. Johnson, subject only to the payment of funeral expenses, expenses of my last illness, and the expense of disposing of my body as hereinbefore designated in paragraph 1, and disposing of my pet cat by chloroforming and disposing of his body in the most humane manner."

The respondent dictated the will, which was drawn and signed in his presence. It was witnessed by his stenographer and by a stenographer from a neighbor-

ing office. The will was left in the custody of the respondent from the date of its execution until the time the respondent sought to administer the estate. The decedent stayed in the presence of the respondent from the beginning of the drafting of the will until its execution. She did not depart from his presence for disinterested advice, no disinterested adviser was present, nor did the respondent suggest to her that she seek the advice of friends in the matter of making him the sole beneficiary under her will.

The respondent testified that the decedent came to his office voluntarily, stated that she wanted him to prepare her will and that it was prepared as she desired; that Mrs. Adams stated she had no heirs or relatives ''entitled to inherit;'' that the testatrix read the will, and when it was executed placed it in his ''safe in the office, and after that was done she said, 'Now you will see that that is carried out, won't you?' And I said, 'You bet your life I will see that it is carried out.' And that, in substance, is all that took place, excepting she told me that she would have any money that she had in the savings account in'' a certain bank, and that in a safety deposit box in another bank would be found all of her papers; that he later ''checked up and found that was correct.''

The only time thereafter that the will was mentioned by Mrs. Adams was on her return that day to her home, when she told a lady she had made the will and fixed her property so that no ''— skunk'' would get it. The reasonable inference is that she meant the son of the man with whom she had been illicitly living.

There is testimony by the respondent that Mrs. Adams called at his office a number of times subsequent to the making of the will, but that the only business transaction was one involving the financial settlement made in 1927 with the man with whom she had

been living, and another matter involving the release of that man from a state institution.

On October 11, 1929, nearly three years after the making of the will, Mrs. Adams died. At the time of her death and prior thereto, she had been failing mentally through advancing senile dementia. Pneumonia was the immediate cause of her death. The attending physician testified:

"Mrs. Adams died—I think I signed the death certificate as influenza—and flu pneumonia, that she had a typical senile dementia, and most of these cases die of pneumonia or some intercurrent disease."

Over the objection of a cousin (the appellant) of the decedent, the will was admitted to probate. The subsequent contest on the grounds of undue influence and mental incompetency resulted as recited above.

 We are convinced by our examination of the record that the evidence preponderates in support of the contention of the appellant that Mrs. Adams was incompetent to make a will December 10, 1926. We have disregarded the issue of undue influence which, appellant insists, is evidenced by failure of respondent to have the decedent consult disinterested persons in the matter of giving her property to her attorney. We have eliminated from consideration the decedent's belief in spiritualism as an evidence of insanity.

"While it is true that a belief in Spiritualism or in any other religious creed, if played upon by one designing to influence, and thereby actually influencing, the believer's testamentary disposition of his property, may invalidate the will on the ground of undue influence, the belief is of itself no evidence of insanity. Opinions on religion and things occult are essentially speculative in their nature. However little they may appeal to the common judgment, and however devoid of objective sustaining evidence alone, they are not badges of insanity.

" 'Manifestly, a man's belief can never be made a test of sanity. When we leave the domain of knowledge and enter upon the field of belief, the range is limitless, extending from the highest degree of rationality to the wildest dream of superstition, and no standard of mental soundness can be based on one belief, rather than another. What to one man is a reasonable belief is to another wholly unreasonable. And while it is true that belief in what we generally understand to be supernatural things may tend to prove insanity under certain circumstances, it is a well known fact that many of the clearest and brightest intellects have sincerely and honestly believed in spiritualism, mind reading, etc.' *Whipple v. Eddy,* 161 Ill. 114, 43 N. E. 789.'' *In re Hanson's Estate,* 87 Wash. 113, 151 Pac. 264.

It is unnecessary to recite the testimony at length as to the exceptional intellectuality of the decedent up to the time she arrived at the age of sixty years and her subsequent rapid mental decline. Standing alone, the delusions of the decedent as to her communications with the dead, particularly her conversations with a dead Indian chief, would not be sufficient to establish lack of testamentary capacity. The belief of the decedent that she would be cured of disease by the magnetic treatments, the laying on of hands, given to her by an almost illiterate person who claimed to have the power of healing by virtue of the spirit control over him by a number of dead physicians, is significant of the decedent's weakened mentality. There were other incidents, the testimony as to which is undisputed, indicative of decedent's lack of testamentary capacity.

A physician who attended Mrs. Adams prior and subsequent to December 10, 1926, the date on which she made the will in question, testified that the decedent was insane, mentally incompetent to transact business. There was other testimony that, for a year

or more immediately subsequent to December 10, 1926, the decedent had an unfounded fear that a certain physician was "going to make away with her body and put it in Lake Union is what she told me." During this same period, she manifested fear of the respondent. Another witness testified that she saw the decedent almost daily from 1918 until the day Mrs. Adams died; that, in 1925 and 1926, the decedent was not competent to do any kind of business; that the deceased was fearful that a physician ".was trying to do away with her;" that when advised to consult her attorney, the respondent, she said, "I have lost confidence in my attorney."

That, shortly after the making of the will, Mrs. Adams forgot the matter, is clearly established by the evidence. Respondent's physician witness testified that Mrs. Adams was in an advanced stage of senile dementia at the time of her death. There was an abundance of medical and lay testimony, which respondent failed to meet, that Mrs. Adams was mentally incompetent to make a will December 10, 1926.

Three cases cited as follows are not in point:

In *In re Adin's Estate,* 112 Wash. 379, 192 Pac. 887, though the will was drafted by a beneficiary thereunder, there was no showing of undue influence. The evidence was clear that the will as written was as the testator desired it, the testator having considered, as the beneficiary advised, for some time prior to the drafting of the will, the matter of bequeathing a smaller amount to his attorney than the testator had in the first instance desired to give to that attorney.

In *In re Adams' Estate,* 120 Wash. 189, 206 Pac. 947, there was no proof of coercion or fraud. There was no suggestion made by the beneficiary to the testator. The will was drawn by an attorney chosen by the testator while the beneficiary was not present. It

was admitted that the testator had sufficient mental capacity.

In *White v. White,* 111 Wash. 354, 190 Pac. 1003, though there was evidence that the testatrix was suffering from senile dementia about a year prior to the making of her will, the testatrix lived for nearly three years thereafter, her condition became much improved, she died from another disease, and witnesses testified that she comprehended the transaction. In the case at bar, the testatrix was suffering from senile dementia at the time she made her will. Her condition became progressively worse. Her death was caused by mental decay. The attending physician called as a witness by respondent testified that "she had a typical senile dementia, and most of these cases die of pneumonia or some intercurrent disease."

We have examined all of the authorities cited. On the facts they are distinguishable from the case at bar.

The judgment is reversed, and the cause remanded with directions to set the will aside.

TOLMAN, C. J., MAIN, BEALS, MITCHELL, and BEELER, JJ., concur.

PARKER and HOLCOMB, JJ., dissent.