[1] Reported in 162 P.2d 245.
Dell Denison, a Syrian, came to this country from Asia Minor, where she was born, about 1900. She married and lived in Seattle with her husband until his death, and thereafter as his widow until she died February 7, 1944, at the age of about seventy-six. All of Mrs. Denison's children died in infancy, and at the time of her death, her heirs at law were a sister, two brothers, and two nieces, the daughters of a deceased brother.
October 12, 1943, Dell Denison made her will devising all of her estate to a friend, Katharine Cross, whom she named sole executrix of her will without bond, the will providing that the executrix act without intervention of the court.
One of Mrs. Denison's brothers, S.D. Milkey, acting for himself and on behalf of her other heirs at law, seasonably contested the will upon the ground that, at the time the will was executed, Mrs. Denison lacked testamentary capacity.
After a hearing upon the issues raised by the contest, the trial court held that the testatrix lacked testamentary capacity and set aside the will. From this order the executrix named in the will has appealed.
Respondents have cross-appealed from that portion of the decree allowing appellant compensation on account of service rendered and for her attorneys. *Page 701 
Our conclusion upon the merits renders consideration of the cross-appeal unnecessary.
The testimony is voluminous, the transcript of the evidence contained in the statement of facts consisting of eight hundred twenty-five pages.
The only question which was submitted to the trial court for determination was whether or not Dell Denison was mentally competent October 12, 1943, when she made and executed the will which the trial court set aside.
During Mr. Denison's lifetime, he and Mrs. Denison acquired several parcels of real estate consisting of a tract on Mercer island, a tract on Aurora avenue upon which was a dwelling which Mrs. Denison occupied as her home for many years, and a small building which she rented for store purposes. She also owned another lot on Aurora avenue upon which were two small houses which she rented. After her husband's death, Mrs. Denison's income consisted of rentals from her various properties. She also at times was assisted by a public welfare agency.
Mrs. Denison had little education. She could write her name after a fashion, but whether she could read either her native Syrian or English is uncertain. She was shrewd and was careful in collecting her rents, being particular always to receive every penny due her.
During the year 1930, her property on Aurora avenue was assessed in considerable amounts for local improvements. In connection with this matter she was represented by Matthew W. Hill, who collected some of her rentals for her and to whom Mrs. Denison would turn over some of the money which she herself collected.
Mr. Hill also attended to the payment of her taxes and assessments. As the years passed, Mrs. Denison suffered many bodily ailments. She suffered from diabetes, her blood pressure was high, and her heart was in bad condition. Her sight failed, cataracts having formed on her eyes, and, during the last months of her life, she was practically blind. As her physical condition deteriorated, she naturally became less and less able to attend to the care of herself and of her *Page 702 
home, and she became suspicious and apparently feared that people would do her injury or would steal her possessions.
It clearly appears that Mrs. Denison was not on intimate or even friendly terms with any of her relatives. Some years prior to her death, she had a disagreement with one of her brothers, who lived in Seattle, and brought a suit against him, which she lost. To this brother, Mrs. Denison had a very definite aversion. It appears that she had also had a disagreement with her sister. Her brother who lived in Montana had testified on behalf of his brother in the lawsuit between the brother and Mrs. Denison, and Mrs. Denison's sister-in-law, the wife of the Montana brother, testified frankly that she saw Mrs. Denison seldom, that they did not get along at all, and that Mrs. Denison never liked her. Neither Mrs. Denison's sister nor her two nieces testified at the hearing; the only evidence in the record concerning the relations of the two sisters being to the effect that they were not friendly. It clearly appears that Mrs. Denison had been on bad terms with her relatives for a period of time long preceding her illness.
Mrs. Denison retained Mr. Hill as her attorney during the year 1930, and thereafter he represented her and with his wife was extremely kind and considerate in assisting Mrs. Denison. Evidently Mrs. Denison appreciated the kindness of Mr. and Mrs. Hill, as she frequently called upon them in time of trouble; she having learned from experience that her calls would not be in vain.
During the spring of 1943, Mrs. Denison's eyesight had become very seriously impaired, and she was in very bad physical condition. Conditions were such that it was apparent even to her that she should no longer live alone. From the record it is very evident that the situation had become acute. Mr. Hill advised Mrs. Denison to sell her home. Certainly, under all the circumstances, it was advisable that Mrs. Denison do this and make other arrangements for her living quarters. A fair offer for the property was made by Mr. and Mrs. Tibbet, and a contract of sale was executed, Mr. Hill having represented Mrs. Denison. There was some sort of an oral understanding that Mrs. Denison could continue *Page 703 
to live in the house and be to some extent cared for by the purchasers. Mrs. Tibbet was to receive an agreed amount each month to compensate her for taking care of Mrs. Denison. It seems probable that Mrs. Denison relied upon this arrangement to a greater extent than she should have done. Mr. Hill testified that it was the understanding that the arrangement referred to would be tried with reasonable expectation that it would be continued, but that at the same time it was recognized that the situation might be unsatisfactory to either party. Mr. Hill testified that he carefully explained the matter to Mrs. Denison, but when after a short time Mr. and Mrs. Tibbet refused to longer care for Mrs. Denison, the latter regretted having sold her property and without the least just cause blamed Mr. Hill for the situation in which she found herself.
Clearly, Mrs. Denison could no longer continue to live alone in her home with only casual assistance from friends and visiting nurses. It does not appear that, for the price she was willing to pay, anyone would have agreed to assume the burden of caring for her. If she was compelled to leave the home, it was undoubtedly better to sell the property on a good market than to undertake to rent it. Beyond question Mr. Hill's advice that the property be sold was sound.
It is evident that Mrs. Denison had the faculty of believing that to be true which she wished to be true. She was very much disappointed when it transpired that Mrs. Tibbet would (or could) no longer care for her in her old home. Her disappointment quite unreasonably resulted in a feeling of dissatisfaction with Mr. Hill because he had advised her to sell the property.
It must be remembered that her life, lonely as it had been for years, her age, her education or lack of it, and the fact that she was, and to an extent always remained, a foreigner caused her mental reactions to unpleasant situations to differ in some respects from those which would generally be considered normal. She had a fixed and definite aversion to hospitals, rest homes, and institutions of that character. Whatever the cause of this feeling, it was so strong as to amount almost to an obsession. *Page 704 
She did have a number of women friends who were kind to her and whom she trusted. Some six or seven years prior to the trial she had conveyed her real estate to Mrs. Maibelle Young, who had for a year or so collected the rents and accounted to Mrs. Denison, to whom she testified she had loaned money. Mrs. Young made no claim that she ever in fact owned the property, and it appears that, at the expiration of about a year, she had reconveyed the land to Mrs. Denison. The two women remained on friendly terms.
During the year 1938, Mrs. Denison became acquainted with Mrs. Katharine Cross, the appellant, executrix, and they became good friends.
For many years Mrs. Denison lived in her home on Aurora avenue, renting rooms therein while her health permitted, and renting her other properties. Her sight having begun to fail, during the winter of 1943 she went to Harborview hospital for the purpose of having an operation performed on her eyes. The doctors being of the opinion that the operation should not then be performed, Mrs. Denison returned to her home, where she remained until the place was sold to C.W. Tibbet, May 16, 1943. A few days thereafter Mrs. Denison required hospitalization and went to Columbus hospital, where she remained for several weeks. In July she returned to her former home under care of Mrs. Tibbet, where within a few days she suffered an injury from a fall and was taken to Harborview hospital for treatment. After a short time she left the hospital and, Mr. and Mrs. Tibbet refusing to again assume the burden of caring for her, Mrs. Denison was taken to a rest home in Seattle, where she remained during the greater part of the month of August. Leaving the rest home, she passed a few days visiting with friends, but at her request Mrs. Cross agreed to take her in, whereupon she was taken to appellant's home, where she remained until October 12, 1943, when she was taken to Providence hospital, where she remained until her death.
It appeared that prior to October 12th, Mrs. Denison had consulted an oculist, whose opinion it was that the time had arrived when the cataracts upon her eyes might be successfully removed. She knew for at least a short time prior to *Page 705 
October 12th that on or about that date she was to be taken to the hospital where she was to undergo the operations for cataracts.
Mrs. Denison was certainly a problem, whether considered as a landlady renting rooms, a paying guest or a patient in a hospital or a rest home. While in the hospitals, Mrs. Denison was a most difficult patient. She carried with her a black bag which after her death was found to contain over twelve hundred dollars in currency, and to friends she criticized the nurses, saying that they stole her things; and she would not co-operate with them in their endeavor to render her the care and service which her condition required. While in a hospital or the rest home, Mrs. Denison was constantly endeavoring to persuade some friend to take her away, saying that she was most anxious to live in a private home. The way in which she succeeded in leaving the rest home is somewhat typical of her general conduct. Mrs. Hill testified that she took Mrs. Denison to the office of a dentist; that when her treatment was finished, Mrs. Denison insisted upon being taken to the home of a friend. Mrs. Hill testified that Mrs. Denison had made up her mind upon this point. Mrs. Hill did take her to the home of Mrs. Denison's friend Mrs. Hughes, who unwillingly kept her for a night. The next day Mrs. Denison was taken to the home of a Mrs. Behneman, where she remained for a short time, when appellant, Katharine Cross, agreed to take Mrs. Denison into her home, which she did; where she remained until she was taken to the hospital as above stated.
In her endeavor to find some friend who would take her in, Mrs. Denison did not confine herself to the truth, but there appears from her statements and conduct a certain consistent plan which she followed with some degree of shrewdness.
Dr. H.J. Lenz, who for many years had been Mrs. Denison's physician, testified that in his opinion she lacked testamentary capacity at the date of the execution of her will. The witness did not see Mrs. Denison between August 10th and the last of October after she had undergone two operations for cataracts. The doctor testified that Mrs. Denison *Page 706 
suffered from diabetes, hardening of the arteries, uncompensated heart, and high blood pressure, and that she was a victim of senile dementia. He stated that in his opinion she had been mentally deranged for the last two years of her life.
Another doctor who specializes in nervous and mental diseases examined Mrs. Denison December 10, 1943, and testified that at that time she was suffering from senile dementia, "a slowly progressive disease which may be present for months or years depending entirely upon the stage that we find the patient in," and that, while it was entirely possible that Mrs. Denison might have been mentally competent on October 12th, he "would not expect her to be capable of making a will that would be legal on that date. The will might speak for itself." This witness based his conclusion to some extent upon a mistake of fact, Mrs. Denison having told him that she had a brother in Seattle (which in fact she did), while the doctor understood that she had no relative in Seattle. The doctor also considered that the fact that Mrs. Denison had made a nonintervention will directing that the executrix thereof serve without bond, was some evidence of lack of mental competency. The doctor stated that the operations for cataracts which Mrs. Denison had undergone after the execution of her will might accelerate mental and physical deterioration in the subject.
The testimony of this witness is not particularly helpful, as he did not see the testatrix until sometime after she had executed the will in question and had undergone two operations for cataracts. It is also clear that the witness based his opinion as to Mrs. Denison's mental capacity to some extent upon erroneous premises.
[1] Another doctor, a psychiatrist, called by respondents, testified in response to hypothetical questions that in his opinion Mrs. Denison was not mentally competent at the date she executed her will.
In such a case as this such testimony is not particularly helpful. In re Miller's Estate, 10 Wn.2d 258,116 P.2d 526. *Page 707 
Many witnesses testified as to Mrs. Denison's mental condition. Several nurses who had cared for her testified that she was mentally incompetent, but their testimony must be considered in the light of the fact that she had been a most unsatisfactory, difficult, and uncooperative patient, had shown that she mistrusted them and had said that she was not receiving sufficient food, that she thought she was being poisoned, and that some of her property had been stolen.
Dr. Lenz testified that in his opinion Mrs. Denison had been incompetent for approximately two years prior to her death. This estimate was certainly incorrect, as up to the late spring or early summer of 1943, she apparently attended to her business affairs and property (save when she was confined to her bed by illness or in the hospital).
[2] It must always be remembered that there is a decided difference between eccentricity, mental peculiarities, misapprehensions, temporary or partial hallucinations on the one hand, and testamentary capacity on the other. Many persons have been at times violently insane, while at other times they were mentally sufficiently normal to enjoy testamentary capacity.
Mrs. Genevieve Rhyne, a witness for respondents, testified that she had been a tenant of Mrs. Denison's, occupying the basement apartment in her home for about a year, portions of 1942 and 1943. She stated that Mrs. Denison, who was then practically blind, would walk around at night, that she needed care, and that the witness at times ran errands for her and took her food. She also stated that Mrs. Denison was quarrelsome and was under the impression that people were stealing her property and lying about her. She testified, as did other witnesses, that Mrs. Denison used very bad language and would frequently curse and swear violently. The witness concluded that Mrs. Denison was not a normal person and that she was irrational and incompetent to transact business. At the same time the witness testified that on the 16th of every month, Mrs. Denison was prompt in collecting her rent from the witness; that she had a receipt book and the witness would write out a receipt which *Page 708 
Mrs. Denison would sign. The witness testified that she paid her rent in cash, after which:
"Q. She could always tell whether you had the correct amount or not? A. Yes. Q. Was she particular about it? A. Yes, right there on the dot and never forgot. Q. And did she always count the money too? A. Yes, she did. You couldn't cheat her a nickel."
The witness also testified that Mrs. Denison collected the rent from four other tenants, and that she always personally attended to collecting her money, save once when she was in the hospital.
Mrs. Rhyne's testimony is typical of a good deal of the evidence in the case. Mrs. Denison was old and sick and practically blind. She was a foreigner who had lived the first thirty years or so of her life in her native Syria, the evidence indicating that it was probable she had never learned to read or write her native language, and that she had then come to this country, where she had married, given birth to children who had died in infancy, and finally been left a widow. She was suspicious, possibly due to the fact that she was, and remained to a great extent, a foreigner. She had a violent temper, which was evidently quite unrestrained; she used bad language, but, at the same time even in old age and with failing sight, she knew exactly when her rent was due, how much was due, and attended to the collection of these rents from four or five tenants. She was also perfectly capable of counting the money paid her and assuring herself that she was receiving her due. She foolishly kept a large amount of cash in her immediate possession, but it is very clear that she never forgot exactly where it was; and it would seem that her expressed suspicions that people were stealing from her could not have been very sincere, as she continued to carry the money around with her. Possibly many of the eccentricities manifested by Mrs. Denison were part of an act which she would put on in order to get her own way. She was determined not to remain in a hospital or rest home, and that she would find some private home where she would be taken care of. She would tell Mrs. Hill that some friend would care for her and persuade *Page 709 
Mrs. Hill to take her to that friend's house. Her schemes were sometimes successful, and friends were induced to take her in for a time. Finally she did persuade Mrs. Cross to care for her.
In regard to Mrs. Denison's relations with her family, it is clear that she did not like them. With all her anxiety to be cared for in a private home, she never requested any one of them to take her into his or her home or to come and live with her and care for her in her own home. She declined an invitation from her brother in Montana to live with him, and, while during the summer of 1943 she was making desperate efforts to find someone who would care for her, it does not appear that she ever once thought of communicating with her own brother who was living in Seattle, even in an attempt to obtain his aid in finding a home for her.
Mrs. Denison's two brothers testified on the trial, as did Mrs. Denison's sister-in-law, the wife of the brother who lived in Montana. The latter witness testified that in July, 1943, she came to Seattle in an endeavor to persuade Mrs. Denison to return to Montana with her and live at her brother's home. It appears that this was done at the suggestion of Mr. Hill. The witness, who was also a Syrian, testified that Mrs. Denison and the witness had "never got along at all," that Mrs. Denison had never liked her and that Mrs. Denison was irrational. Asked why she did not take Mrs. Denison home with her, she answered:
"A. She wouldn't go with me. She said I wanted to take her there to freeze her, and so she wouldn't go with me; but she promised she would stay in the Rest Home until I came back, and I offered to pay for her while she was in the Rest Home. I saw the head nurse and told her I would pay for her as long as she was in the Rest Home."
It is evident that, in spite of her great desire to leave the rest home where she was during her sister-in-law's visit, she did not wish to go to Montana to live with her brother.
We shall now discuss the circumstances under which the will here in question was prepared.
Mrs. Cross testified that on the morning of October 12, 1943, Mrs. Denison told her that she wished to make a will *Page 710 
in her favor. There is no contention that the will was the result of undue influence. As above stated, the sole question presented is the testamentary capacity of the testatrix. Mrs. Cross, being at a loss as to how to proceed, telephoned a friend of hers who she knew was a notary public, who advised her that he did not feel qualified to draw a will. Mrs. Cross then called another acquaintance who was a real estate agent, who advised Mrs. Cross to telephone Ford Q. Elvidge, a member of the bar of this court. Mrs. Cross was not acquainted with Mr. Elvidge or any member of the firm of which he is a partner. Mrs. Cross then telephoned Mr. Elvidge's office and talked to Miss Mary H. Alvord, a member of the firm of Hyland, Elvidge and Alvord, who informed her that Mr. Elvidge was not available that day and that as October 12th was a holiday the office would close at noon. Miss Alvord then spoke to Monroe Watt, a practicing attorney of approximately ten years' standing, who was a junior member of the firm. Mr. Watt telephoned Mrs. Cross and made an appointment to call at her home during the course of the afternoon. He testified that he went to the address given and was admitted to the house by Mrs. Cross and by her introduced to Mrs. Denison, who was sitting in an easy chair and told him that she desired to make her will leaving her property to her friend Mrs. Cross. Mrs. Cross then left the room, and Mr. Watt testified that he discussed the matter with Mrs. Denison at considerable length. Mrs. Denison spoke with a strong foreign accent and Mr. Watt at first had some difficulty in understanding her. As the conversation proceeded, however, he became able to understand her. He stated that Mrs. Denison told him that she was practically blind and was about to undergo operations which might improve her vision.
From Mr. Watt's testimony, it appears that he followed a very thorough and lawyer-like method in determining whether or not Mrs. Denison was acting under duress or undue influence on the part of any person, and also to ascertain whether she enjoyed testamentary capacity. He testified that Mrs. Denison told him that she had two brothers, *Page 711 
a sister, and several nieces. She said that she had been married, was a widow, and that she had had some children who had all died in infancy. She also explained that she had had trouble with her relatives, including a lawsuit with her brother who lived in Seattle; that she had preferred to live with friends rather than with her relatives, and she emphatically expressed her intention not to leave her relatives any portion of her property. She told Mr. Watt that she had made a will, but that she desired to change it. The record is silent as to when this will was made, or in whose favor.
Mrs. Denison described to Mr. Watt the property which she owned, going into some detail; and apparently was correct in all particulars both as to her relatives and her property.
When Mr. Watt became satisfied that Mrs. Denison was competent to make her will, he prepared it in due form, and Leta Cutrell and Myrtle A. Compton, neighbors, were called in to act as witnesses. In the presence of the witnesses, Mr. Watt read the will to Mrs. Denison, who because of her impaired vision was unable to read it herself, and, she having declared it to be her will and signed it, all formalities having been followed, the document was witnessed by the ladies mentioned and by Mr. Watt. Mrs. Denison then paid Mr. Watt his charge for drawing the will.
It is of course true that by this will Mrs. Denison left nothing to her brothers and sister, who were "natural objects of her bounty," although this description is generally applied to a spouse, children, or parents. In this connection, however, it is proved conclusively by the record that Mrs. Denison was angry with her relatives and at no time manifested any disposition or desire to see them, to be with them, to have anything to do with them, or to give or leave them any of her property.
Mr. Hill testified that between 1934 and 1937, Mrs. Denison at various times expressed to him the wish that he have her property. The record clearly shows that any friend who would give Mrs. Denison a home and treat her with kindness and consideration would for the time being at least have *Page 712 
been the beneficiary or a considerable beneficiary in any will which she might execute. The fact that by her will she left nothing to her relatives is entirely consistent with her mental attitude of years' standing, dating back through a period long before there could be any question as to her mental capacity.
Unless Mr. Watt's testimony is to be disbelieved and disregarded, it appears that upon the afternoon of October 12th, Mrs. Denison knew that she was going to the hospital that evening to undergo serious operations upon her eyes; that she knew exactly what property she owned, the condition of her property, and some details concerning the same; that she correctly described her living relatives and clearly expressed her intention not to name any one of them as a beneficiary in her will.
The trial court in its comprehensive memorandum opinion indulged in no criticism of Mr. Watt's testimony and made only brief reference thereto.
Clearly it was the trial court's view that Mrs. Denison's many eccentricities, her continued complaints that people who were undoubtedly honest and honorable in every way were taking advantage of her, and even that some had stolen from her, coupled with the testimony of Dr. Lenz, who had been her physician for many years, and of Mr. Hill, who had been her attorney and had been most kind and helpful to her, and also the expert medical testimony, compelled the conclusion that Mrs. Denison was a victim of senile dementia in so advanced a stage that she lacked testamentary capacity.
Certainly Mrs. Denison was often most unreasonable, was eccentric to a degree, indulged in fits of temper, and often made statements which were untruthful. However, we think that from the evidence it must be accepted as a fact that she was mentally competent within a period not long prior to October, 1943, and that at all times up to that date she knew what she wanted to do and consistently followed plans which she believed would enable her to accomplish *Page 713 
her desire, namely, to procure a home with some friend. This objective she did finally attain when Mrs. Cross took her into her home.
In 32 C.J. 609, Insane Persons, § 60 g, is found the following concerning senile dementia:
"Senile dementia, as the words indicate, is that diminution and weakness of the mental faculties which result from old age; that peculiar decay of the mental faculties which occurs in extreme old age, whereby the person afflicted is reduced to second childhood. It is a form of insanity in the aged; a mental disorder frequently attacking the faculties of old persons; mental imbecility from old age. Senile dementia differs both in process and progress of decay. It cannot be described by any positive characters. It begins gradually and is progressive in character; in its gradual advance to incompetency, it embraces a wide range of infirmity, varying from simple lapse of memory to complete inability to recognize persons or things."
In 68 C.J. 442, Wills, § 39, is found the following:
"Senile dementia, often a result from old age, does not necessarily result in mental incapacity to make a will, but there must be such a failure of mind as will deprive the testator of intelligent action. The disease is progressive in nature, and it must be determined whether its progress has so impaired the faculties of the testator that they fall below the mark of legal capacity. This must be determined not alone by the nature and tendency of the disease, but by its effect in the particular case."
In the case of Gates v. Cole, 137 Iowa 613, 115 N.W. 236, the supreme court of Iowa reversed a decision of the trial court on appeal from an order setting aside a will on the ground of mental incapacity on the part of the testatrix and undue influence. It was contended that the testatrix was the victim of senile dementia. Concerning this affliction the supreme court said:
"Before we discuss the evidence upon which the contestants rely, it will be well to note what senile dementia really is. That it differs greatly both in process and progress of decay is freely admitted by all writers on the subject. Medical observers say that it cannot be described by any positive characters; that in its gradual advance to incompetency, it *Page 714 
embraces a wide range of infirmity, varying from simple lapse of memory to complete inability to recognize persons or things; `that often the mental infirmity of the aged is by no means as serious as might be supposed at first sight, and that, to use a figure of speech, the mind may be superficially rotted while it is sound at the core.' It is generally said that one of the surest symptoms of mental decay is the loss of memory; and especially in respect of names and dates; but it is fully recognized in the authorities that, while an old person may appear oblivious in such matters, his mental grasp of the relations he sustains to others and more especially to the immediate members of his family, and to others who would be the natural objects of his bounty, and of his own interest and affairs, his capacity and solid understanding may still remain firm. Failure of memory is not alone enough to create testamentary incapacity, unless it extends so far as to be inconsistent with the `sound and disposing mind and memory' requisite for all wills. `Great age alone does not constitute testamentary disqualification,' and `there is no presumption against a will because made by a man of advanced age, nor can incapacity be inferred from an enfeebled condition of mind or body.' Horn v. Pullman, 72 N.Y. 269. The law wisely sustains wills made by persons of impaired mental and bodily powers, provided it appears that the will is the uninfluenced act of the testator, and he has the requisite intelligence to comprehend the condition and extent of his property and remember the persons who would ordinarily be his beneficiaries. In Banks v. Goodfellow, L.R. 5 Q.B. 549, Chief Justice Cochburn held that, though mental power be reduced in old persons below the ordinary standard, yet, if the testamentary act is understood and appreciated in its different bearings, if the mental faculties retain enough strength to comprehend the transaction entered upon, the power to make a will remains. In other words, to constitute seniledementia, there must be such a failure of the mind as to deprive the testator of intelligent action. Such is the rule of our own cases, and the rule established by the great weight of authority. [Citing cases.]"
After discussing the evidence, the Iowa court observed that it was not shown that the testatrix had forgotten her relations or friends or had failed to recognize them, or that she was oblivious to her property rights and interests. The supreme court upheld the will, holding that the evidence did *Page 715 
not support the conclusion of the trial court to the effect that the testatrix lacked testamentary capacity.
In the case of Wisner v. Chandler, 95 Kan. 36, 147 P. 849, the supreme court of Kansas reversed a decision of the trial court setting aside a will because of lack of testamentary capacity on the part of the testator. The court discusses at length the condition described as that of senile dementia, saying with reference to this disease:
"While the course of the disease is chronic and advances to a fatal end, it develops gradually and is quite variable in duration. It usually lasts several years, although a few acute cases have been observed. It is sometimes subject to remissions in which mental balance is regained. Defects of memory are the earliest symptoms, first, memories of recent things, and then older memories. Afterwards the power of intellectual comprehension and assimilation is lessened, the judgment begins to fail, ethical feelings degenerate, the will becomes weakened, coarser instincts acquire ascendency, hallucinations and illusions manifest themselves, and the mental reduction continues until the extreme degree of dementia is reached.
"When a will has been made after some or many of the symptoms of senile dementia have been observed the law does not say, these symptoms prove the testator had senile dementia, senile dementia destroys the mind, consequently the will was made by one of unsound mind. The question of testamentary capacity remains in substance and effect just what it was in the Marquis ofWinchester's Case, decided by the court of King's Bench at the Trinity term, held in the forty-third year of the reign of Queen Elizabeth.
"`And because it appeared by divers witnesses, and by many notorious circumstances, that the said Marquess being sick etmulta provectus senectute, was not of sane and perfect memory, such as the law requires at the time of the making of the said supposed will (for by law it is not sufficient that the testator be of memory when he makes his will, to answer familiar and usual questions, but he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason; and that is such a memory which the law calls sane and perfect memory).' (Marquess of Winchester's Case, 3 Coke's Reports, 302, 77 Eng. Reports, Full Reprint, 287.)" *Page 716 
Beyond question, no one who had known Mrs. Denison for ten years prior to her death would have expected that by her will she would leave any of her property to her relatives. Regardless of whether or not any just reason for her antagonistic feeling toward them existed, she undoubtedly had such sentiments to a considerable degree. While from the viewpoint of her blood relatives the will which she made may in a sense be said to be "unnatural," it was undoubtedly the will which one who knew her would have expected that she would make unless she experienced a decided change in her mental attitude toward her relatives.
In the case of In re Schafer's Estate, 8 Wn.2d 517,113 P.2d 41, this court upheld the will of an aged lady made when she was in the hospital suffering from a mortal disease, holding that a will in favor of one not a relative and which disinherited relatives whom she had named as beneficiaries in prior wills was valid.
In In re Bottger's Estate, 14 Wn.2d 676, 129 P.2d 518, this court discussed the question of testamentary capacity, and upheld the will of an aged lady which was contested upon the ground that the decedent was of unsound mind and acted under undue influence.
Concerning the matter of testamentary capacity, this court, after citing cases, said:
"Those cases hold that a person is possessed of testamentary capacity if at the time he assumes to execute a will he has sufficient mind and memory to understand the transaction in which he is then engaged, to comprehend generally the nature and extent of the property which constitutes his estate and of which he is contemplating disposition, and to recollect the objects of his bounty. This is the standard by which courts must measure the facts of each case in which it is contended that an instrument offered or accepted as the will of a decedent was executed at a time when the testator lacked capacity to make a valid testamentary disposition of his property."
[3, 4] In will contests courts have repeatedly observed that each case must be decided upon its own facts in view of certain general principles of law. *Page 717 
We are mindful of the principle relied upon by the respondents repeated by this court in In re Chapin's Estate, 17 Wn.2d 196, 135 P.2d 445, as follows:
"Deathbed wills, executed in the presence of beneficiaries who otherwise would not have shared in the estate, should be viewed with the greatest suspicion and all of the evidence subjected to the closest scrutiny."
Respondents strongly rely upon In re Forsman's Estate,177 Wn. 38, 30 P.2d 941; In re Johanson's Estate, 178 Wn. 628,35 P.2d 52; and In re Lundgren's Estate, 189 Wn. 33,63 P.2d 438.
We can merely repeat that each case must be decided upon its own facts and that the line of demarcation between testamentary capacity on the one hand and incapacity on the other is frequently difficult to trace.
Respondents in their brief several times refer to the fact that Mrs. Denison was blind. It is true that her vision was extremely limited, but while that fact made her dependent upon other persons for care, it has little bearing upon the presence or lack of testamentary capacity on her part.
Respondents call attention to the fact that certain persons who by their testimony might have thrown some light on Mrs. Denison's mental condition were not called as witnesses by appellant.
Under the circumstances disclosed by the record, it would seem that the fact that these persons were not called as witnesses is no more an implication against one party to this proceeding than the other. The witnesses might have been called by either party.
Mrs. Cross testified that no limitation had been placed on the time Mrs. Denison should remain at Mrs. Cross' home. One witness testified that, while Mrs. Denison was at the rest home, Mrs. Cross, referring to Mrs. Denison, had said to the witness that "she would not take that nut home with her." Mrs. Cross categorically denied that she made any such statement. In any event, she did take Mrs. Denison into her home, and apparently the arrangement was eminently satisfactory to Mrs. Denison. *Page 718 
Respondents also refer to the fact that immediately after the execution of the will Mrs. Denison was taken to the hospital. Evidently the fact that Mrs. Denison was going to the hospital on the evening of October 12th, caused her to execute her will on that day. The situation would be no different had the will been executed days or weeks previously.
[5] Contracts between old persons needing care and attention and some person who agrees to render the necessary service in consideration of receiving property belonging to the persons requiring care, are very common. Always in such contracts there is an element of uncertainty. Such a contract formally executed and delivered is valid, if the person owning the property dies shortly after its execution. On the other hand, that person may live long and have the better of the bargain. One in Mrs. Denison's situation occupies a more advantageous position by making a will in favor of the person rendering the care than if such person should make an absolute conveyance of the property, because a will (unless part of a contract) may be revoked at any time. It does not appear that there was any contract between Mrs. Denison and Mrs. Cross, but the motive behind the execution of the will seems reasonably clear. Mrs. Denison's great desire was to be cared for in a private home. Mrs. Cross had taken Mrs. Denison into her home, thereby assuming a very considerable burden which apparently no one else was willing to undertake. Apparently the last weeks of Mrs. Denison's life outside of the hospital were rendered as comfortable as might be by the attentions of Mrs. Cross. At least just before leaving for the hospital, Mrs. Denison executed the will in question. Doubtless she expected to recover from the operations which she was to undergo, and that she would again need a home. It seems highly probable that she believed that Mrs. Cross would again assume the burden of caring for her. What would have happened had Mrs. Denison recovered sufficiently to leave the hospital, we do not know, but if when she made her will she possessed testamentary capacity, her will is valid. Doubtless Mrs. Denison believed that the execution of a will in favor of Mrs. Cross *Page 719 
would tend to induce the latter to continue the arrangement which was evidently satisfactory to Mrs. Denison.
The record shows a mental operation on the part of Mrs. Denison which is inconsistent with the existence of a case of senile dementia so advanced as to deprive her of testamentary capacity. In most cases in which the contention has been made that a testator was suffering from senile dementia and for that reason lacked testamentary capacity, it has also been contended that the will attacked was void because of undue influence. These two grounds for attack are often linked together. In the case at bar there is no contention that the will was induced by undue influence.
Careful study of the record convinces us that the trial court erred in finding that Mrs. Denison's will which was admitted to probate should be set aside because of lack of testamentary capacity on her part.
The order appealed from is accordingly reversed, with instructions to reinstate the will as a valid expression of Mrs. Denison's testamentary wishes.
BLAKE, ROBINSON, GRADY, JEFFERS, and MALLERY, JJ., concur.